## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUIS PETERS, Derivatively on Behalf of Nominal Defendant EASTMAN KODAK COMPANY, | Case No. |
| Plaintiff, | |
| v. | |
| JAMES V. CONTINENZA, DAVID E. BULLWINKLE, ROGER W. BYRD, RICHARD TODD BRADLEY, GEORGE KARFUNKEL, PHILLIPE D. KATZ, JASON NEW, and RANDY VANDAGRIFF, | |
| Defendants, | |
| and | |
| EASTMAN KODAK COMPANY | |
| Nominal Defendant. | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff Louis Peters ("Plaintiff"), by and through his undersigned counsel, submits this Verified Stockholder Derivative Complaint (the "Complaint") against certain current and former directors and officers of Eastman Kodak Company ("Kodak" or the "Company") for violations of the federal securities laws, breaches of fiduciary duties, and unjust enrichment. Except for the allegations specifically pertaining to Plaintiff, which are based upon Plaintiff's personal knowledge, the allegations of the Complaint are based upon the investigation conducted by

Plaintiff's counsel, which included, among other things, a review of filings made with the U.S. Securities and Exchange Commission ("SEC"), filings and orders entered in *Letitia James v. Eastman Kodak Co., et al*., Index No. 451652/2021 (N.Y. Sup. Ct. June 1, 2021) (the "NYAG Action"), press releases, news reports, and other publicly available documents.

On May 19, 2021, Plaintiff commenced a related derivative action in state court, captioned *Peters v. Continenza, et al.* Index No. E2021004462 (N.Y. Sup. Ct.) (the "State Action"). Plaintiff files the instant action with the intent of consolidating it with another derivative action pending in this Court, *Silverberg v. Continenza, et al.*, No. 6:21-cv-06567-EAW ( "*Silverberg*") and coordinating the federal actions with the previously filed State Action in the interests of judicial efficiency and economy.

## **NATURE OF THE ACTION**

1.      On July 27, 2020, Kodak's Executive Chairman and Chief Executive Officer ("CEO") James Continenza ("Continenza") and General Counsel Roger Byrd ("Byrd") convened Kodak's board of directors (the "Board") and Compensation, Nominating and Governance Committee ("CNG Committee"). The Board meeting was called on short notice. Continenza and Byrd updated the Board on the next morning's public announcement that Kodak had signed a letter of intent ("LOI") to receive a $765 million federal loan from the U.S. International Development Finance Corporation ("DFC") in order to manufacture pharmaceutical products (the "DFC Loan"). The Board meeting also contained one rushed agenda item: to approve the grants of millions of stock options to Kodak insiders before Kodak's stock price rose upon the DFC LOI's announcement. The Board approved Continenza and Byrd's recommendation to grant them options to purchase 1.75 million shares and 45,000 shares of Kodak's common stock, respectively. Kodak's Chief Financial Officer ("CFO") David E. Bullwinkle ("Bullwinkle") and Senior Vice President Randy D. Vandagriff ("Vandagriff"), also received 45,000 options each.

2.      Most of the stock options granted had an exercise price of $3.03 per share.  This meant that when an option recipient chose to exercise an option, she would pay Kodak $3.03 per share, and then could sell that share on the open market at prevailing prices and keep the difference for herself.

3.      When news of the DFC LOI was announced the next morning, Kodak's stock price shot up, as the Board knew it would.  Then, after Continenza appeared on CNBC on July 29, 2020 before the market opened and said that Kodak could "bank" on getting the DFC Loan, and that Kodak's pharmaceuticals business would be profitable and competitive, Kodak's stock price skyrocketed from a closing price of $2.62 on July 27, 2020 to a high of $60 per share on July 29, before eventually closing at $33.20 that day.

4.      Granting options like the Kodak Board did—in advance of positive news—is called "springloading."[1]  Springloading is both illegal as a matter of corporate law, and a violation of Kodak's compensation policies.  First, springloading violates Kodak's obligation to grant stock options at the fair market value of Kodak stock at the time of their granting.  When insiders have material non-public information ("MNPI") that the stock market does not have, the option's exercise price is not reflective of the shares' fair market value.  Springloaded options also violate the Company's promise to stockholders that it is using stock options as "incentive" compensation: recipients are not incentivized to improve the company's stock price if they receive stock options that are immediately "in the money" upon receipt.  Finally, springloaded options violate the Company's policy against "manipulat[ing] the timing of . . . any Equity Award with the intent of benefiting a grantee."

---

[1] *See, e.g.*, *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 592-93 (Del. Ch. 2007).

5.     Springloaded stock option recipients are also unjustly enriched at the Company's expense.  When the stock price shoots up, the recipient can exercise the option by paying Kodak the artificially-low exercise price, selling the share, and pocketing the difference.  The recipient thus is able to purchase a Kodak share for an unfairly low price and sell it in the market for an unearned profit.

6.     In addition to receiving springloaded options, Continenza bought 46,737 Kodak shares for himself on June 23, 2020 (the "June Trades"), just weeks before the DFC LOI and DFC Loan were announced.  At the time he bought these shares, Continenza knew that Kodak was deep in negotiations with the DFC about the DFC Loan that were full of positive signs, including that Kodak had signed a Letter of Intent to sell pharmaceutical products to Phlow Corporation ("Phlow"), a pharmaceutical manufacturer that had a long-term, $812 million contract to provide medicine to the government.  Continenza also knew that this information was MNPI, and thus knew that the stock purchases were underpriced and unlawful.  Significantly, when Continenza made the trades, he had not sought pre-clearance from Byrd via email one day in advance, as Company policy required him to do, nor received a response from Byrd that the trades were permissible.

7.     When Kodak's option springloading and Continenza's June Trades with MNPI were revealed, the government launched various investigations and put the DFC Loan on hold.  To Plaintiff's knowledge, the schemes may have cost Kodak the DFC Loan, along with the long-term value the loan was predicted to have created for Kodak and its stockholders, including over $150 million in EBITDA by 2025.

8.     Finally, one member of Kodak's Board, George Karfunkel ("Karfunkel"), used Kodak's stock price jump as an opportunity to commit tax fraud.  Karfunkel claimed on August 4,

2020, to have donated 3 million of his Kodak shares one week earlier, on July 29, 2020, to a charity that he founded and controls. Kodak's average intraday stock price on July 29, 2020 was $38.75 per share, which was $23.38 higher than the $15.37 average intraday price on August 4, 2020—after the unlawful option and trading schemes were revealed. The charity, which was founded in 2018, purports to be an orthodox Jewish synagogue, yet is located in a single room on a residential street in Brooklyn. It has just three officers, including Karfunkel. As described herein, Karfunkel did not actually gift 3 million Kodak shares on July 29, 2020. Rather, he fraudulently claimed to have done so to derive additional personal tax benefits from the scheme. Kodak's General Counsel Byrd, who successfully lobbied the Board to grant himself 45,000 springloaded options on July 27, 2020, was aware of Karfunkel's tax fraud scheme. Byrd did nothing, however, likely because Karfunkel owned 21% of the Company and thus exerted significant control over Byrd's livelihood. Byrd and Karfunkel are therefore both responsible for the additional damages to Kodak caused by Karfunkel's scheme, including reputational damage, costs of managing governmental and other investigations, and potentially the loss of the DFC Loan.

9.     On August 13, 2020, Plaintiff sent a shareholder demand (the "Litigation Demand"), as he was required to do pursuant to N.J.S.A. § 14A:3-6.3, demanding that Kodak's Board take action to remedy the misconduct of certain current and former officers and directors of the Company relating to the DFC Loan, the springloaded option grants, and the various stock sales and purchases of Kodak directors and officers. *See* Exhibit A.

10.    Kodak's Board formed a special committee comprised of two Board members (the "Special Committee," or "SC") to investigate the various wrongdoing alleged herein.

11.    Neither of the Special Committee members were appropriate choices to lead such an investigation. Both have longstanding ties and other entanglements with Kodak, its Board, and

management.  One of the two SC members personally approved the springloaded option grants that he was charged with investigating.  Kodak's Board knew, when appointing the Special Committee to investigate the potential wrongdoing, that neither of its members would ever conclude that the Board had engaged in misconduct.

12.     On September 15, 2020, the Special Committee published the results of its investigation (the "SC Report" or "Report").  *See* Exhibit B.  The SC Report whitewashed the entire episode.  According to the SC Report, there was nothing wrong with the Board granting springloaded options just hours before the federal loan was announced; there was nothing wrong with Continenza's June 2020 stock purchases; and there was nothing wrong with a Board member committing tax fraud on the back of the Company's announcement of the DFC Loan.

13.     While Kodak's Board has reached a self-interested conclusion that it did nothing wrong, the Company has suffered financial and reputational harm as a result of the Board's misconduct.  Plaintiff seeks to prosecute the wrongdoing that the Board wishes to sweep under the rug, through the vehicle of this derivative suit, brought under N.J.S.A. § 14A:3-6.2.

14.     On November 6, 2020, in reliance on the SC Report's unreasonable and bad faith conclusions, Kodak's Board improperly and unreasonably refused Plaintiff's Litigation Demand. *See* Exhibit C.

15.     Plaintiff is not the only party who was unconvinced by the SC Report's exoneration of Defendants' misconduct.  On November 26, 2020, the NYAG served Kodak with a subpoena. Then, after receiving and reviewing confidential information from Kodak, on June 1, 2021, the NYAG filed an *Ex Parte* Application in the NYAG Action stating that it had determined to file a complaint against Continenza for trading in Kodak securities on MNPI, and seeking additional documents from Kodak, as well as public testimony from Continenza and Byrd.  Significantly, the

*Ex Parte* Application cited material facts that the NYAG unearthed from its investigation that were omitted from, and undermined the reasoning and conclusions in, the SC Report. Among other things, the NYAG Action revealed (1) a slew of MNPI, available to Continenza when he bought his Kodak shares, indicating that the outcome of the DFC Loan application was likely to be positive; and (2) that Continenza did not preclear the June Trades in accordance with Company policy. On June 15, 2021, the New York Supreme Court ordered Kodak to produce additional documents to the NYAG, and Byrd and Continenza to give public testimony on September 24 and October 1, 2021, respectively.

16. On September 17, 2021, the Board formed a second special committee (the "Second Committee") and informed Plaintiff of its intent to re-investigate the claims brought by Plaintiff in state court and by the plaintiff in *Silverberg*. Plaintiff submits that Kodak's decision to form the Second Committee is a tacit admission that the original Special Committee's investigation was deficient.

17. Plaintiff anticipates that Defendants will seek to rely on the conclusions of the Special Committee and/or the Second Committee in seeking to dismiss this lawsuit. Accordingly, Plaintiff files this Complaint, and intends to file specified, limited requests for discovery as contemplated by N.J.S.A. § 14A:3-6.5(5)(c). Prior to ruling on any such motion by Defendants, the Court should grant Plaintiff's discovery requests under N.J.S.A. § 14A:3-6.5(5)(c), as the allegations herein evidence the Special Committee and the Second Committee's lack of independence and good faith.

## **PARTIES**

18. Plaintiff is a current beneficial owner of Kodak stock. Plaintiff was a Kodak stockholder at the time of the wrongdoing alleged herein, and has been a Kodak stockholder continuously since that time. Plaintiff is a citizen of Missouri.

19.     Nominal defendant Kodak is a New Jersey corporation with its principal executive offices located at 343 State Street, Rochester, New York.  While Kodak is a necessary party to the litigation, Plaintiff asserts no claims against Kodak; rather, it brings this action for the benefit of Kodak.

20.     Defendant Continenza has served as a Kodak director since April 2013.  He was made Board Chairman in September 2013, and Executive Chairman with CEO responsibilities in February 2019, upon the former CEO's resignation.  On June 23, 2020, Continenza purchased 46,737 shares of Kodak stock for an average price of $2.22 per share based on his knowledge of MNPI, namely the status of the Company's negotiations over the DFC Loan (the "June Trades"), about which the New York Supreme Court has ordered him to give public testimony in the NYAG Action on October 1, 2021.  On July 27, 2020, the day before the DFC LOI was announced, Continenza convened the Board and CNG Committee to grant him 1.75 million options to purchase Kodak stock at exercise prices ranging from $3.03 per share to $12 per share.  The Company also formalized Continenza's CEO title that day.  When Kodak's stock price closed on July 29, 2020, after the DFC Loan was announced and Continenza told the entire market that Kodak could "bank" on getting the DFC Loan, and that Kodak's pharmaceutical business would be profitable and competitive, Continenza's stock purchases and springloaded stock options had instantly become worth tens of millions of dollars more than they were two days earlier.  Continenza is a citizen of Florida.

21.     Defendant Byrd has worked at Kodak since 2015, including as Assistant General Counsel from 2015 to January 2019, and General Counsel and Secretary since January 2019.  Byrd was integrally involved in the negotiations over the DFC Loan as a member of the Executive

Review and Management team, alongside Continenza and Bullwinkle.[2]  Byrd, without any corroborating documentary evidence, claims to have precleared Continenza's June Trades, and has been ordered by the New York Supreme Court to give public testimony about the June Trades on September 24, 2021.[3]  Byrd convened the July 27, 2020 Board and CNG Committee meeting with Continenza, and was called upon for his legal advice regarding the stock option grants at issue. Byrd authorized the Board to proceed with the option grants, despite the fact that the grants violated corporate law and the Company's own compensation policies.  Byrd himself later admitted to the Special Committee in an interview that he recognized that the option grants at least raised "optics" concerns.  Byrd's advice green-lighting the springloaded option grants was likely tainted by the fact that he was himself a recipient of 45,000 options at that meeting.  Byrd is a citizen of New York.

22.     Defendant Bullwinkle has worked at Kodak since 2008, and as Kodak's CFO since July 2016.  On July 27, 2020, at a Board meeting that Bullwinkle attended, the Board granted Bullwinkle options to purchase 45,000 shares of Kodak stock while the Board and Bullwinkle knew that Kodak stock would certainly go up materially the next morning when news of the DFC Loan was released.  Bullwinkle was integrally involved in the negotiations over the DFC Loan as a member of the project's "Executive Review and Management" team alongside Continenza,[4] who Bullwinkle reports to, and Defendant Byrd.  Bullwinkle is a citizen of New York.

---

[2] Affirmation of Jeffrey A. Novack in Support of the Attorney General's *Ex Parte* Application for An Order Pursuant to General Business Law § 354, NYAG Action, Doc. No. 7 (June 2, 2021) ("Novack Aff.") ¶ 22.

[3] *Ex Parte* Order Pursuant to General Business Law § 354, NYAG Action, Doc. No. 9 (June 15, 2021) ("NYAG Action Order"), at 2.

[4] Novack Aff. ¶ 22.

23.     Defendant Vandagriff has worked at Kodak since 2004, and as Senior Vice President of Kodak's Digital Print business since January 2020.  Vandagriff received 45,000 options at the July 27, 2020 Board meeting.  Vandagriff reports directly to Continenza.  Vandagriff is a citizen of Ohio.

24.     Continenza, Bullwinkle, Byrd, and Vandagriff are sometimes referred to herein as the "Option Recipients."

25.     Defendant Karfunkel served as a Kodak director from September 2013 through May 19, 2021, when the Company held its annual meeting and Karfunkel did not stand for re-election.  As of March 2020, Karfunkel and other "entities affiliated with his family" owned 21% of Kodak's stock.[5]  On August 4, 2020, Karfunkel claimed to have taken advantage of Kodak's elevated stock price by donating 3 million shares of Kodak stock on July 29, 2020 to a charity he founded.  As described herein, the bona fides of the charity are certainly questionable, as is Karfunkel's claim that he had donated 3 million Kodak shares to it on July 29, 2020.  Karfunkel is a citizen of New York.

26.     Defendant Phillipe D. Katz ("Katz") has served as a director of Kodak since February 2019, and a Board observer since as early as 2016.  Katz was the Chair of the CNG Committee in July 2020, when the CNG Committee authorized the springloaded option grants. Katz is a citizen of New York.

27.     Defendant Richard Todd Bradley ("Bradley") served as a Kodak director from June 2017 until his resignation on December 24, 2020.  Bradley served on the CNG Committee when it authorized the springloaded option grants.  Bradley is a citizen of California.

---

[5] Report at 12.

28.     Defendant Jason New ("New") has served as a director of Kodak since September 2013.  New was a member of the CNG Committee that authorized the springloaded option grants. He was also appointed to serve as one of two members of the Special Committee and one of three members of the Second Committee.  By placing New on the Special Committee, the Board essentially asked New to investigate the propriety of his own misconduct.  By placing New on the Second Committee, the Board asked him to reconsider the propriety of his own conduct and his conclusion as part of the Special Committee that he did nothing wrong.  New worked until 2019 as a managing director of Blackstone Group L.P.  ("Blackstone"), a New York City investment company.  As part of its substantial investment in Kodak, Blackstone designated New and Karfunkel as its representatives on the Kodak Board.  The Board knew, or should have known, that New could not faithfully serve as a Special Committee member (or Second Committee member) charged with investigating Karfunkel's alleged tax fraud.  New is a citizen of New York.

29.     The Option Recipients, together with Karfunkel, Katz, Bradley and New, are sometimes referred to herein as the "Individual Defendants" or "Defendants."

## JURISDICTION AND VENUE

30.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) (the "Exchange Act"), because this action arises under federal law for violations of Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b)), as amended by the Private Securities Litigation Reform Act of 1995, and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). This Court has supplemental jurisdiction over the non-federal claims asserted herein under 28 U.S.C. § 1367(a). This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332(a)(2), because complete diversity exists between Plaintiff and each defendant, and the amount in controversy exceeds $75,000.

31.     This Court has personal jurisdiction over all Defendants pursuant to § 27 of the

Exchange Act, as well as New York Civil Practice Law and Rules ("CPLR") §§ 301 and/or 302,

because all Defendants are either "at home" in New York or have engaged in purposeful activity

in this District.   Plaintiff's claims arise from and involve transactions bearing a substantial

relationship to Defendants' purposeful activity in this District.

32.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C.

§ 1391.   A substantial part of the acts and omissions giving rise to the claims alleged herein

occurred in this District, and certain of the Defendants reside in and/or have their principal place

of business within this District.   Kodak maintains its principal executive offices in this District.

33.     In connection with the acts and conduct alleged herein, the Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the U.S. mails, interstate telephone communications, and the facilities of the New York Stock

Exchange.

## SUBSTANTIVE ALLEGATIONS[6]

### A.     Kodak Connects with Phlow as Part of Its Pandemic Responsive Initiative; Phlow Connects Kodak with the White House

34.     Chemical manufacturing has long been a part of Kodak's business.   Kodak has

manufactured various products and chemical compounds utilized in pharmaceutical

manufacturing, including Key Starting Materials ("KSMs") that pharmaceutical companies use to

---

[6] A significant portion of Plaintiff's allegations are derived from the SC Report, as noted.   Plaintiff
has not been able to test the veracity of the SC Report, however.

make Active Pharmaceutical Ingredients ("APIs") that are used to make final drug products.[7]  APIs require regulatory approval, while KSMs do not.[8]

35.     In 2020, as the COVID-19 pandemic caused severe drug shortages, Kodak saw an opportunity to expand its pharmaceutical business, including by making more KSMs and producing APIs.[9]  "Kodak began 'cold calling' government officials and agencies in an effort to find an opportunity to partner with the government to leverage Kodak's chemical manufacturing capacity and expertise to respond to COVID-19."[10]  Kodak gave its initiative a code name to maintain the project's confidentiality: "Project Tiger."[11]

36.     As part of Project Tiger, Kodak's Vice President of Public Affairs contacted the Biomedical Advanced Research and Development Authority ("BARDA"), a federal agency tasked with investing in countermeasures to diagnose, treat and protect against COVID-19.[12]  BARDA recommended that Kodak contact Phlow, a pharmaceutical management company focused on securing domestic drug reserves.[13]  At the time, Phlow was negotiating its own contract with BARDA to manufacture medicines to treat COVID-19 patients.[14]

---

[7] Report at 10-11.

[8] *Id.* at 11.

[9] *Id.* at 13

[10] *Id.* at 14.

[11] *Id.* at 38; Novack Aff. ¶ 13.

[12] Report at 15.

[13] *Id.*

[14] *See* Tom Porter, *The Trump Administration Gave a Drug-Making Contract Worth Up to $812 Million to a Small Virginia Firm Founded Less Than 6 Months Ago*, BUSINESS INSIDER (May 20, 2020) (indicating Phlow submitted its proposal to the government in March 2020), https://www.businessinsider.com/coronavirus-trump-admin-gives-812m-contract-to-small-virginia-firm-2020-5.

37.     By March 2020, Kodak management was acquainted with Phlow and its CEO Eric Edwards ("Edwards"), who explained that he had been working with Congress, the White House and various government agencies to return pharmaceutical manufacturing to the U.S.[15]

38.     In early April 2020, Phlow connected Kodak with Peter Navarro ("Navarro"), the Director of the White House Office of Trade and Manufacturing Policy ("OTMP"), who was shepherding Phlow's negotiations with the government.[16]  Phlow also connected Kodak with Chris Abbott ("Abbott"), a White House senior policy analyst.[17]  Kodak had its first call with Navarro and Abbott on April 2, 2020.[18]  Phlow participated.[19]  "Kodak had several follow up discussions with Navarro and Abbott in April and May 2020."[20]

39.     On May 14, 2020, President Trump issued an executive order under the Defense Production Act to let the DFC issue loans to support the "domestic production of strategic resources needed to respond to the COVID-19 outbreak."[21]

**B.      Phlow Secures an $812 Million Contract with BARDA**

40.     On May 18, 2020, BARDA awarded Phlow an $812 million contract to manufacture "generic medicines and pharmaceutical ingredients that are needed to treat Covid-19 but [were then] made overseas[.]"[22]  The initial term of the contract was for four years, for $354

---

[15] Report at 15.

[16] Porter, *supra* n.14.

[17] Report at 16.

[18] *Id*.

[19] *Id*.

[20] *Id*.

[21] *Id.* at 17.

[22] Sheryl Gay Stolberg and Katie Thomas, *Trump to Tap New Company to Make Covid-19 Drugs in the U.S.,* THE NEW YORK TIMES (May 18, 2020), https://www.nytimes.com/2020/05/18/us/politics/trump-coronavirus-drug-manufacturing.html.

million, with an option to extend up to ten years for a total of $812 million.[23]  Phlow's CEO Edwards explained that Phlow "intended to create . . . a stockpile for pharmaceutical ingredients to be used in the event of drug shortages or a national emergency."[24]

**C.    Kodak Makes Its First Proposal to the White House, Which Tells Kodak to "Think Bigger"**

41.    On May 22 and 28, 2020, Kodak employees had conversations with Navarro and Abbott about Kodak's ability to manufacture APIs, which Phlow, among others, would need to manufacture medicine to treat COVID-19.[25]

42.    Continenza participated in the May 22 call with Navarro and Abbott.[26]  Before the call, "Abbott requested information on how Kodak could obtain [regulatory] compliance in order to manufacture APIs in an expedited manner."[27]  Abbott also "asked whether there were 'capital investments or things of that nature that could help [Kodak] become cost competitive in the long-run[.]'"[28]  During the call, Kodak requested $27 million in order to quickly bring itself into regulatory compliance to manufacture APIs.[29]  Navarro told Continenza he wanted Kodak to "think bigger"[30] and more "long term."[31]  He told Kodak he wanted a "well-fleshed out" proposal by Wednesday, May 28, 2020.[32]

---

[23] *Id.*

[24] *Id.*

[25] Report at 17, 18.

[26] *Id.* at 17.

[27] *Id.*

[28] *Id.*

[29] *Id.* at 17-18.

[30] *Id.* at 18.

[31] *Id.*

[32] *Id.*

43.     After the call, Abbott emailed Continenza and wrote "that he would 'work on seeing if we can get a non-recourse loan mechanism set up, as discussed.'"[33]   Abbott then "suggested that Phlow [] assist Kodak with the next proposal."[34]   Kodak employees worked around the clock to meet the May 28 deadline.[35]

44.     On May 28, 2020, Kodak presented Navarro and Abbot with a proposal seeking a grant of approximately $435-$575 million to establish a new U.S. Advanced API Manufacturing Center.[36]   "Navarro asked for a more detailed and thorough proposal and set a deadline for June 3, 2020, the following week."[37]   At Phlow's suggestion, Kodak hired a technical consultant, EverGlade Consulting ("EverGlade"), to assist Kodak with its more detailed proposal, including financial modeling and selection of APIs.[38]   Kodak paid Everglade over $350,000 in June alone.[39]

45.     On May 31, 2020, Abbott followed through on his May 22 representation that he would "work on seeing if we can get a non-recourse loan mechanism set up."   Abbott, by text message, set-up a call between Kodak and the DFC, which was issuing loans, for the following day.[40]   Continenza and other Kodak management, including Bullwinkle and Byrd, participated in the June 1, 2020 call, as did Phlow's CEO Edwards.[41]   "During the call, the DFC personnel walked Kodak through the agency's loan application process and the concept of how a non-recourse

---

[33] *Id*.

[34] *Id*.

[35]*Id*.

[36] *Id*.

[37] *Id*.

[38] *Id*.

[39] Novack Aff. ¶ 17.

[40] Report at 19.

[41] *Id.*

financing loan might work."[42]   Byrd remarked to Continenza that the process was "[m]oving fast."[43]

46.     Kodak had several follow-up discussions with Abbott and the same individuals from the DFC in the first week of June 2020.[44]   Accordingly, Abbott directed Kodak to give the "more detailed and thorough proposal" that Navarro had requested to the DFC, instead of Navarro.[45]   The DFC would also soon appoint Alale Allal ("Allal") as Kodak's primary point of contact, with whom "Continenza had frequent one-on-one calls [] to answer or ask questions."[46] Kodak also continued communicating with Abbott through text messages and phone calls "regarding Kodak's specific manufacturing capabilities."[47]

### D.     Kodak and Phlow Execute LOIs Concerning Kodak's KSMs and APIs

47.     On June 8, 2020, Kodak and Phlow entered into a Letter of Intent "in which they contemplated a long-term supply contract through which Kodak would supply Phlow with certain APIs and KSMs."[48]   Phlow, of course, needed KSMs and APIs to make medicine pursuant to its contract with BARDA.  The LOI thus assumed that Kodak would be manufacturing APIs, based at least in part on Kodak's discussions with the government, many of which Phlow attended.

48.     On June 9, 2020, Kodak's Chief Technical Officer ("CTO") Taber ("Taber") emailed a colleague and wrote that the DFC loan application process was "going well."[49]

---

[42] *Id.*

[43] Novack Aff. ¶ 18.

[44] Report at 19.

[45] *Id.*

[46] *Id.* at 20, 22.

[47] *Id.* at 20.

[48] *Id.* at 16.

[49] Novack Aff. ¶ 19.

49.     On June 11, 2020, Kodak's Managing Director of Corporate Development Paula Gutkin ("Gutkin") directed the Company to "create a new project clearance list for Project Tiger," which she described as a "highly confidential project."[50]  Continenza and Byrd were included on the Project Tiger Clearance List.[51]

50.     On June 12, 2020, Kodak's CTO Taber sent Continenza and Bullwinkle a PowerPoint deck titled "Project Tiger: Application for DFC-DPA Loan Program (DCF-014)" (the "Project Tiger Deck").[52]  The deck included the following timeline for the loan application process: (1) the application would be submitted on June 26, 2020; (2) the application would be finalized by the end of June 2020; (3) a LOI with the government would be signed in mid-July 2020; and (4) the loan would be awarded in mid-August 2020.[53]  This anticipated timeline was in fact exactly how events eventually played out.

51.     On June 15, 2020, Kodak signed another LOI with Phlow (the "Phlow LOI") that again contemplated Phlow purchasing chemicals from Kodak.[54]  Kodak entered into the LOI "in furtherance of its application to the DFC to show it had a customer for its future APIs."[55]  Indeed, the LOI reflected that Kodak had secured a long-term, federally-backed customer for its future pharmaceutical products that would inspire confidence with the DFC in Kodak's ability to repay the loan.  Kodak in fact submitted the Phlow LOI to the DFC with a cover letter from Taber that

---

[50] *Id.* ¶ 20.

[51] *Id*.

[52] *Id.* ¶ 21.

[53] *Id.*  The June 12 Project Tiger Deck also "listed the 'Executive Review and Management' team as including Continenza, [Bullwinkle], [Taber] and [Byrd]."  *Id.*  ¶ 22.

[54] *Id.* ¶ 23.

[55] Report at 21.

read: "[This Letter of Intent] reflects the conversations with the WH [White House] and with the

DFC on achieving this US-based manufacturing solution."[56]  The letter continued:

> Recently, these discussions have highlighted the necessity for Phlow
> and Kodak to formalize their intent with a supply agreement that
> enables this manufacturing solution and provides part of the basis for
> a DFC loan to fund Kodak's proposal.[57]

Thus, Kodak leveraged Phlow's contract with BARDA as part of its DFC Loan application.

52.    Also on June 15, 2020, a colleague asked Defendant Bullwinkle if he was

"optimistic"[58] about the DFC Loan application process.  Bullwinkle replied, "Optimistic yes!"[59]

**E.    Kodak Files Its Preliminary Loan Application and Warns Team Members
that Project Tiger May Constitute MNPI**

53.    Kodak filed a preliminary loan application on June 16, 2020.[60]  That same day, a

DFC representative contacted Continenza and other Kodak representatives and told them that he

heard things were "moving along which is great."[61]

54.    On June 17, 2020, Continenza texted his administrative assistant that he "had calls

all night with [the] White House."[62]  His assistant responded: "That's good though!"[63]  Continenza

texted back: "Very . . . Still in it."[64]

---

[56] Novack Aff. ¶ 24.

[57] *Id*.

[58] *Id.* ¶ 25.

[59] *Id*.

[60] Report at 21.

[61] *Id*. at 22.

[62] Novack Aff. ¶ 27.

[63] *Id*.

[64] *Id*.

55.     On June 18, 2020, Continenza met with Kodak's senior management team to provide a "White House Update."[65]  Continenza also emailed Phlow's CEO Edwards and wrote: "Thank you 100% for everything you are doing.  Not just for Kodak but for the country.  Look forward to building an alliance together for all of America."[66]

56.     Over the next few days, management continued supplementing its DFC Loan application with financial models and other materials.[67]

57.     On Thursday, June 18, 2020, Kodak emailed all Project Tiger team members informing them that they "been added to the clearance list for a confidential project"[68] (the "June 18 Email").  The June 18 Email included a link to an internal memo (the "Project Memo") that instructed Project Tiger team members that "[t]he information you receive in the course of Kodak's consideration of the Project may from time to time constitute such material non-public information."[69]  The Project Memo warned Project Tiger team members against trading in Kodak stock with MNPI, and instructed them to pre-clear any transaction with Byrd before trading.[70] "Kodak does not give this admonition on all of its coded projects.  Rather, it is generally reserved for projects with large dollar values or that are otherwise significant."[71]

58.     Over the next few days, the Project Tiger team continued working on Kodak's financial model for the DFC loan application.[72]

---

[65] *Id.* ¶ 28.

[66] *Id.* ¶ 30.

[67] *Id.* ¶ 31.

[68] Report at 38-39.

[69] *Id.* at 39.

[70] *Id.*

[71] Novack Aff. ¶ 29.

[72] *Id.* ¶ 31.

**F.      Three Days After Continenza Acquires Kodak Stock in Contravention of Kodak's Insider Trading Policy and on the Last Day of a Window Period, Kodak Submits Its Final Loan Application**

59.      On the afternoon of June 23, 2020, Continenza purchased 46,737 shares of Kodak stock at an average price of $2.22 per share (the "June Trades").  June 23, 2020 was the very last day of a "Window Period" that had been open since May 15, 2020, during which Kodak insiders were allowed to transact in Kodak stock.[73]

60.      Continenza did not make the June Trades in compliance with Kodak's insider trading policy.  The policy requires insiders to (1) "'pre-clear any transaction in Kodak Securities even during a Window Period' by submitting a request via email to Byrd at least one day in advance of the proposed transaction";[74] and (2) wait to transact in Kodak stock until they "receive a response whether or not the transaction is permissible."[75]  Continenza did neither.[76]

61.      Also on June 23, 2020, at Continenza's direction, Kodak awarded $30,000 in bonuses to Project Tiger team members.[77]

62.      Three days later, and perfectly aligned with the timeline in the June 12 Project Tiger Deck, Kodak submitted its final loan application to the DFC.[78]  Kodak's financial model projected that Kodak's pharmaceuticals business would generate revenues of more than $200 million by 2024, and more than $300 million by 2025, with further increases to follow.[79]  Kodak also projected internally that its pharmaceuticals project would soon be profitable, with positive cash

---

[73] Report at 37-38.

[74] *Id.* at 36.

[75] Novack Aff. ¶ 35.

[76] *Id.*

[77] *Id.* ¶ 37.

[78] Report at 23.

[79] Novack Aff. ¶ 44.

flow and EBITDA of more than $150 million by 2025.[80]  These figures were significant, considering Kodak's 2019 net income was $116 million, and its 2019 EBITDA was $95 million.

### G. The DFC Approves a LOI with Kodak and Instructs Kodak to Prepare for a Public Announcement and Signing Ceremony

63.     The DFC conducted due diligence on Kodak's application through early and mid-July 2020.[81]  As early as July 8, 2020, Allal suggested that DFC representatives might want to conduct a site visit at Kodak's headquarters in Rochester, NY.[82]

64.     The visit was initially scheduled for July 15, 2020, but then was rescheduled for Wednesday, July 22, 2020.[83]  After Continenza and Bullwinkle led Allal on a tour of Kodak's Rochester operations, Allal said he needed to make some phone calls and stepped away.[84]  He returned and told Continenza, Bullwinkle and other Kodak management that the DFC wanted to enter into a LOI with Kodak regarding the loan.[85]  DFC representatives also told Kodak they wanted to issue a press release announcing the LOI and to hold a public signing ceremony on Tuesday, July 28, 2020.[86]  Kodak received the first draft of a term sheet from the DFC, laying out the terms of the $765 million loan, the next day.

65.     The days leading up to the DFC's July 28, 2020 public announcement, and particularly over the weekend of July 25 and July 26, were filled with significant media relations planning, including (1) Kodak's contact with Empire State Development and Governor Cuomo's

---

[80] *Id.*  "EBITDA" means Earnings Before Income Tax Depreciation and Amortization.

[81] Report at 24.

[82] *Id.* at 26.

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.* at 27.

office; (2) the scheduling of an in-person press event between Continenza and various government officials for the afternoon of July 28; and (3) the drafting of press materials that stated that Kodak's new manufacturing initiative "could change the course of history for Rochester and the American people."[87]  In addition, sometime prior to July 28, the DFC agreed that Continenza would have an exclusive interview with *The Wall Street Journal* that was published at 6:00 AM on July 28.[88]

### H.   The July 27, 2020 CNG Meeting and the Springloaded Option Grants

66.    Continenza and Byrd convened Kodak's Board and CNG Committee on Monday, July 27, 2020 for a joint meeting.[89]  Byrd wanted the CNG Committee to grant options to members of senior management, including himself.  Byrd had structured the options grants so the lowest exercise price was $3.03 per share, and Byrd wanted the CNG Committee to award the options "while [Kodak's] stock price was trading below the lowest strike price"[90] (i.e., before the DFC LOI was announced on July 28 and Kodak's stock price rose).

67.    The July 27, 2020 meeting was held telephonically, with "Bullwinkle as an observer."[91]  Management used a PowerPoint deck to "walk the Board through the details of the LOI and Kodak's business plan for pharmaceutical manufacturing."[92]  The PowerPoint deck included, *inter alia*, "a full overview of the business plan," "financial projections and details on the estimated costs and timeline, operational and headcount needs, and anticipated loan terms."[93]

---

[87] *Id.* at 29-30.

[88] *Id.* at 32.

[89] *Id.* at 50 ("a CNG Committee meeting [was held] on Monday, July 27, 2020 **with** the Board meeting" (emphasis in original)).

[90] *Id.* at 55-56.

[91] *Id.* at 50.

[92] *Id*.

[93] *Id*.

68.     Byrd then addressed the options grants with the CNG Committee members.  Byrd relied on a draft of his PowerPoint that he did not share with the CNG Committee, because he had not had time to finalize it prior to the meeting.[94]  Toward the beginning of Byrd's presentation, CNG Committee member Bradley "had to leave the call to avoid missing a previously scheduled flight."[95]  He "gave [Defendant] Katz, via email, his proxy to vote consistent with Katz's decision on the grants."[96]

69.     After Byrd's presentation, Defendants Katz and New voted in favor of awarding the options grants to management, including Continenza, Byrd and Bullwinkle, who were in attendance.  Specifically, the CNG Committee authorized the issuance of 1.75 million stock options to Continenza, in the following tranches:

| Number of Options | % of Grant | Exercise Price |
| --- | --- | --- |
| 981,707 | 56% | $3.03 |
| 298,780 | 17% | $4.53 |
| 298,780 | 17% | $6.03 |
| 170,733 | 10% | $12.00 |

70.     The CNG Committee also awarded 45,000 stock option grants to each of Bullwinkle, Byrd and Vandagriff in the following tranches:

| Number of Options | % of Grant | Exercise Price |
| --- | --- | --- |
| 15,000 | 33.33% | $3.03 |
| 10,000 | 22.22% | $4.53 |
| 10,000 | 22.22% | $6.03 |
| 10,000 | 22.22% | $12.00 |

---

[94] *Id.* at 51.

[95] *Id*.

[96] *Id*.

## I.      The Market Reacts to the DFC Loan

71.      Kodak's stock price closed on July 27, 2020 at $2.62 per share.

72.      On July 28, 2020, Kodak and the DFC announced the DFC LOI and held the public signing ceremony.  *The Wall Street Journal* published an article about the DFC LOI, and quoted Continenza as saying that "he expects the loan to create around 300 jobs in Rochester, and 30 to 50 in Minnesota."[97]  Kodak's stock price closed at $7.94 per share.

73.      On July 29, 2020, before the market opened, Continenza appeared on CNBC's *Squawk Box* to discuss the DFC LOI.  *Squawk Box* asked Continenza whether Kodak believed it would receive the DFC Loan.  Specifically, Continenza was asked:  "Is this a done deal?  There are some people [] saying the government's gotta do some due diligence . . .  Do you expect [] that we can bank on this, James?[98]  Continenza answered in the affirmative:

> [W]e feel very comfortable that we can bank on it.  We have some work to do, but we wouldn't have probably made the announcement and everyone come up and do what we did yesterday . . . We [] feel very comfortable we're gonna get to the end game.  We signed a letter of interest, but we've been working on this for a few months.  We feel very comfortable we're gonna get to the end game or we wouldn't probably be sitting here.[99]

74.      *Squawk Box* also asked Continenza whether Kodak's pharmaceuticals business would be profitable.  Specifically, Continenza was asked:  "Is this going to be very profitable for

---

[97] Rachael Levy, *Kodak Shifts Into Drug Production With Help of $765 Million U.S. Loan*, THE WALL STREET JOURNAL (July 28, 2020), https://www.wsj.com/articles/kodak-lands-765-million-u-s-loan-in-start-of-medical-supply-chain-fix-11595930400.

[98] Pippa Stevens, Kodak executive chairman addresses jump in trading before government deal was announced, CNBC (July 29, 2020) (video at 00:26 – 00:39), https://www.cnbc.com/2020/07/29/kodak-executive-chairman-addresses-jump-in-trading-activity-before-government-deal-was-announced.html; *see also* https://www.cnbc.com/squawk-box-us/ (identifying Squawk Box as a "pre-market" program).

[99] Stevens, *supra* n.98 (video at 00:41 - 1:08).

Kodak?  Because there's a reason we outsourced a lot of the basic ingredients as a country . . .  to places where it's much cheaper to do this like India or China or wherever."[100]  Continenza again answered in the affirmative:

> It is . . . we're repurposing about a third uh forty percent of the buildings we have so we don't have new construction . . . . So by repurposing reusing buildings we already own that drops a lot of our costs.  And through continuous manufacturing and innovation, we feel that we can become very competitive . . . .[101]

75.    After Continenza's *Squawk Box* appearance, Kodak' s stock price opened at $18.43 per share on July 29, 2020.

76.    Continenza then appeared on *Fox Business News* at 10:42 a.m. on July 29, 2020, touting the DFC loan.[102]  By that time, Kodak's stock price was trading above $53 per share. Continenza told *Fox Business News* that Kodak would use the loan to "supply about 25% of the small molecule [] KSMs and APIs" "for the US supply chain, with other partners."[103]  Continenza's reference to "other partners" was likely Phlow.

77.    Continenza was also interviewed by *Yahoo! News* on July 29, 2020, and asked about the profitability of Kodak' pharmaceuticals project.  Continenza reiterated that Kodak would "have several supply agreements" with other US manufacturers, and "jointly we know we can be competitive."[104]  Continenza explained that Kodak was building on its existing chemical business

---

[100] *Id*. (video at 3:30 – 3:49)

[101] *Id*. (video at 3:50 – 4:32).

[102] *Kodak CEO: We will be supplying US with key materials for pharmaceuticals*, FOX BUSINESS NEWS (July 29, 2020), https://video.foxbusiness.com/v/6176288801001#sp=show-clips.

[103] *Id*. (video at 1:27 – 1:39).

[104] *Kodak CEO on federal deal: 'We're more of a chemical company' than a camera brand*, YAHOO! FINANCE (July 29, 2020) (video at 1:59 - 2:15), https://www.yahoo.com/now/kodak-ceo-were-more-of-a-chemical-company-than-a-camera-brand-174409937.html.

to produce APIs first in batches and then continuously: "We're going to move from batch manufacturing to continuous manufacturing to keep that costs down and that's where it's at.  If you look at the jobs we are creating, it looks like 300."[105]  When asked when the government would start using APIs from Kodak, Continenza explained: "We are moving as quickly as we can . . . we will create 300 jobs, about 1200 indirect jobs in upstate New York area."[106]

78.     Kodak's stock price closed at $33.20 per share on July 29, 2020, after reaching a high of $60 per share and trading at an average price of $38.75.

**J.     The Springloaded Option Grants Did Not Comply With Kodak's Option Granting Policies**

79.     Kodak's 2013 Omnibus Incentive Plan (the "Plan" or "Executive Compensation Plan") governs the Company's awarding of equity-based incentive compensation.  The Plan authorizes the CNG Committee to award Company stock and options to Company executives and directors.  The Plan's stated purpose is to "attract, retain and motivate" Kodak employees and "to promote the success of the Company's business by providing Participants with appropriate incentives."[107]

80.     The Plan provides that the exercise price of any options "shall not be less than one-hundred percent (100%) of the Fair Market Value of a Share on the date of grant."  "Fair Market Value" is defined as the closing price of Kodak stock on the date of the award.

81.      Kodak's Executive Compensation Committee Policy on Equity Awards (the "Policy") also explicitly forbids manipulating the timing of stock based compensation, as follows:

---

[105] *Id.* (video at 2:45 – 3:10).

[106] *Id.* (video at 6:32 – 7:39).

[107] Report at 42.  Kodak has attached a copy of the Plan to numerous SEC filings, including its 2018 and 2020 annual proxy statements.

**Timing of Public Announcements**. The Company's policy is that neither the Committee nor any employee of the Company will backdate an Equity Award, or manipulate the timing of the public release of material information or of any Equity Award with the intent of benefiting a grantee under an Equity Award.

82.     The July 27, 2020 springloaded options did not comply with either the Plan or the Policy.  These options were not used to "attract, retain, or motivate" the Option Recipients. Typically, stock options work to incentivize a company's employees by encouraging them to work to make the company's stock price go up.  But when the stock price jump is already a sure thing, springloaded options are merely a windfall giveaway from the corporate treasury.

83.     The springloaded options were not granted at Fair Market Value because the market price of Kodak stock did not reflect MNPI concerning the DFC Loan—information that would (and did) cause the Company's stock price to rocket up upon its release.

84.     The springloaded options violated Kodak's Policy because Defendants "manipulate[d] the timing of . . . [an] Equity Award with the intent of benefiting [the Option Recipients]."

### K.     Defendants Made Materially False and Misleading Statements in Furtherance of their Springloading Options Scheme

85.     Defendants have made numerous materially false and misleading statements as part of the springloading options scheme.

86.     First, Continenza, Byrd and the CNG Committee misled Kodak into granting springloaded options by falsely representing that the options were priced at fair market value. Kodak then relied on Defendants' misstatements in granting options to the Option Recipients for far less than they were worth.

87.     Second, Defendants continued the scheme by causing Kodak to issue materially misleading and false statements in its SEC filings to cover up their misconduct, including in their

financial reports that understated the amount of compensation the Option Recipients had received. Thus, Defendants caused Kodak to (1) understate compensation expenses and liabilities it was required to incur, which in turn overstated net income, income from operations and retained earnings; (2) misrepresent that Kodak properly accounted for its stock-based compensation; and (3) represent that the CNG Committee issued stock compensation in accordance with the terms of the Executive Compensation Plan.

88.     For example, on July 29, 2020, Byrd signed as attorney-in-fact an amended Form 4 (the "July 29 Form 4/A") filed on behalf of Continenza that stated that the July 27, 2020 options grants "were out-of-the-money when granted." This was false.

89.     On November 10, 2020, Kodak filed its quarterly report on Form 10-Q (the "3Q20 10-Q"), which stated: "[t]he valuation of the stock options granted on July 27, 2020 resulted in approximately $11.8 million of compensation expense being recognized in the three months ended September 30, 2020[.]" Continenza and Bullwinkle certified the statements as true and accurate.

90.     On March 16, 2021, Kodak filed its annual report on Form 10-K (the "2020 10-K") that stated that the stock options granted on July 27, 2020 "resulted in approximately $12.6 million of compensation." Defendants Continenza, Bullwinkle, Karfunkel, Katz, and New certified the statements as true and accurate.

91.     On April 9, 2021, Kodak filed its annual proxy statement on Schedule 14A (the "2020 Proxy"), which stated that the Continenza's July 27, 2020 options award had a "grant date fair value" of $11,112,869, and the "grant date fair value" of the award for each of Bullwinkle and Byrd was $322,267. Continenza signed the enclosed shareholder letter, and Byrd signed the Notice of the 2020 Annual Meeting of Shareholders "By Order of the Board of Directors."

L.      **Defendant Karfunkel's Tax Fraud Scheme**

92.     On August 4, 2020, Defendant Karfunkel and his wife Renee Karfunkel filed with the SEC a Schedule 13D claiming to have made a donation of 3 million of their 6.3 million Kodak shares to Congregation Chemdas Yisroel Inc. ("Chemdas Yisroel"), a charitable foundation that Karfunkel founded and controls, on July 29, 2020.

93.     The IRS values charitable gifts of stock by using the average of the day's high and low prices.  Kodak stock hit $60 on July 29, 2020, and its average price that day was $38.75 per share.  If Karfunkel had actually donated 3 million shares on July 29, 2020, those shares would be valued at $116 million for federal tax purposes.[108]  On August 4, 2020, however, Kodak stock closed at $14.40 per share.  In the intervening days, as described below, the press had started reporting on Continenza's June Trades and the springloaded stock option grants, and the Company's stock price fell as a result.

94.     Karfunkel's chosen charity appears to be a sham.   Chemdas Yisroel was incorporated in December 2018.  Karfunkel was listed in securities filings as the charity's President, and is one of only three officers at the charity.  The organization's registration also listed as its Secretary "a former executive of a Karfunkel company who is listed as the accountant for the Karfunkels' family foundation in federal tax filings."  *The Wall Street Journal* later reported that, while the organization described itself as an Orthodox Jewish synagogue, in fact it only

---

[108] Theo Francis, Mark Maremont & Geoffrey Rogow, *Kodak Insider Makes Well-Timed Stock Gift of $116 Million to Religious Charity He Started*, THE WALL STREET JOURNAL (Aug. 11, 2020, 4:51 PM), https://www.wsj.com/articles/kodak-insider-makes-well-timed-stock-gift-of-116-million-to-religious-charity-he-started-11597154826.   The Special Committee, seemingly unaware of this IRS rule, instead used the closing price to value the donation: "[b]ased on the closing Kodak share price on July 29, 2020, $33.20, the charitable gift would be valued at approximately $99.6 million."  Report at 57.

appeared to have "a small space attached to a three-story apartment building on a quiet side street . . . . A small nameplate on the building's exterior is the only visible sign of its location."[109]

95.     Karfunkel not only appeared to have backdated his "gift"; he also sought to revise the amount of his gift after the fact.  On January 14, 2021, Karfunkel filed with the SEC a Schedule 13D that purported to reduce the donation from 3 million to 1,937,708 shares.  According to the filing, "Amendment No. 2 reported that the Reporting Persons donated 3,000,000 shares of the Common Stock; however, the correct number of shares of Common Stock donated by the Reporting Persons was 1,937,708, which is reflected herein."

96.      On a Form 4 filed on January 12, 2021, meanwhile, Karfunkel reported that he had disposed of 2,000,000 shares as a bona fide gift on July 29, 2020.  There is no explanation as to why this Form 4 does not have the same share amount as the Schedule 13D filed two days later.

97.     Importantly, there is also no explanation provided by Karfunkel or anyone else for the more than one million share decrease in the amount of shares that were purportedly donated more than five months prior.  A charitable gift of shares cannot be reduced after ownership of the shares has been transferred.  As explained to *The Wall Street Journal* by prominent securities attorney Alan L. Dye from the law firm Hogan Lovells: "If you've made an effective gift, it means you no longer own those shares. If part of the gift is somehow rescinded, that would be a separate reportable transaction . . . . Something just doesn't add up."[110]  As a result, this change in the

---

[109] Theo Francis, Mark Maremont & Geoffrey Rogow, *Kodak Insider Makes Well-Timed Stock Gift of $116 Million to Religious Charity*, THE WALL STREET JOURNAL (Aug. 11, 2020), https://www.wsj.com/articles/kodak-insider-makes-well-timed-stock-gift-of-116-million-to-religious-charity-he-started-11597154826.

[110] Mark Maremont, *Kodak Director Makes Retroactive Cut to Huge Charity Stock Gift,* THE WALL STREET JOURNAL (Jan. 13, 2021, 3:53 PM), https://www.wsj.com/articles/kodak-director-makes-retroactive-cut-to-huge-charity-stock-gift.11610571219?cx_testId=3&cx_testVariant=cx_2&cx_artPos=0&mod=WTRN).

number of shares raises significant doubt that the shares were actually donated on July 29, 2020, or at all.

      **M.**      **The Fallout:  Government Investigations, Securities Class Actions Filed**

      98.      On July 29, 2020, Continenza, Bullwinkle, Byrd and Vandagriff each filed a Form 4 disclosing the springloaded option awards they had just received.  After the markets closed that day, a few media outlets reported on Continenza's award and unearned windfall.[111]  On July 30, Continenza filed the Form 4/A, claiming his springloaded options resulted from an earlier understanding with Kodak's Board.  As correctly noted by journalists, however, the purported understanding between Continenza and Kodak's Board "had previously neither been listed in his employment contract nor made public."[112]  Moreover, "[t]he decision to grant Continenza options was never formalized or made into a binding agreement, which is why it was not disclosed previously."[113]

      99.      The next day, July 31, 2020, additional news outlets, including *The Wall Street Journal*, reported on the springloaded options.  As a result, Kodak's stock price plummeted from a closing price of $33.20 per share on July 29, to $21.85 per share on Friday, July 31.  News of the springloaded options continued to explode over the weekend.

---

[111] *See*, *e.g*., Jessica DiNapoli, *Kodak CEO's fortune swells $79 million as stocks rally on U.S. government loan*, REUTERS (July 29, 2020), https://www.reuters.com/article/us-eastman-kodak-ceo-idUSKCN24U3BG.

[112] Jessica DiNapoli & Tom Bergin, *Eastman Kodak top executive got Trump deal windfall on an 'understanding,'* REUTERS (Aug. 1, 2020), https://finance.yahoo.com/news/exclusive-eastman-kodak-top-executive-022621821.html.

[113] *Id*.

100. At the same time, there were growing questions regarding why Kodak was selected for a loan related to pharmaceutical supplies instead of companies with more experience in the pharmaceutical industry.

101. As a result, Kodak's stock price plummeted another $6.91 per share, to close at $14.94 on Monday, August 3, 2020.

102. Also on August 3, 2020, Senator Elizabeth Warren submitted to the SEC a letter requesting an investigation of Kodak for apparent violations of securities laws and SEC regulations, including Continenza's June Trades. This letter was widely reported the following day, when Kodak's stock price closed at $14.40. According to the letter:

> [t]he purchase of stock by Mr. Continenza . . . while the company was involved in secret negotiations with the government over a lucrative contract raises questions about whether [he] potentially made investment decisions based on material, non-public information . . . .

103. Also on August 4, 2020, *The Wall Street Journal* reported that the SEC was "expected to examine the stock option granted to executives on July 27."[114]

104. On August 5, 2020, several House Congressional committees sent a joint letter to Continenza requesting documents regarding the DFC Loan, as well as trading activity by Company executives before the loan was announced. The letter explained that its investigation was regarding the "DFC's decision to award this loan to Kodak despite your company's lack of pharmaceutical experience and the windfall gained by you and other company executives as a result of this loan raise questions that must be thoroughly examined." The committees also sent a document request to DFC CEO Adam Boehler on the same day seeking documents related to the DFC Loan.

---

[114] Dave Michaels & Theo Francis, *Kodak Loan Disclosure and Stock Surge Under SEC Investigation*, THE WALL STREET JOURNAL (Aug. 4, 2020), https://www.wsj.com/articles/kodak-loan-disclosure-and-stock-surge-under-sec-investigation-11596559126.

105.    In a letter to the SEC dated August 5, 2020, United States Representative Maxine Waters, Chairwoman of the House Committee on Financial Services, and other members of Congress expressed "serious concerns arising from a series of securities transactions engaged in by [Kodak], its executive officers and its board members . . . at, or around, the time Kodak learned it could be eligible to receive a $765 million loan."

106.    On Friday, August 7, 2020, after the market closed, the DFC announced, "On July 28, we signed a Letter of Interest with Eastman Kodak.  ***Recent allegations of wrongdoing raise serious concerns.  We will not proceed any further unless these allegations are cleared.***" (Emphasis added).  That Monday, Kodak's stock price opened at $8.90, after closing at $14.88 per share on August 7.

107.    To this date, Plaintiff is unaware whether the DFC intends to proceed with the DFC Loan.

108.    On August 13, 2020, a securities class action lawsuit was filed on behalf of Kodak stockholders against the Company, Continenza, and Bullwinkle in Federal District Court in the District of New Jersey, and on August 26, 2020, a securities class action lawsuit was commenced against Kodak and Continenza in the Federal District Court in the Southern District of New York.[115]  These actions seek damages and other relief based on alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  The actions were subsequently transferred to and consolidated in this Court.[116]

---

[115] *See Tang v. Eastman Kodak Co., et al.*, Civil Action No. 3:20-cv-10462-FLW-ZNQ (D.N.J.); *McAdams and McAdams v. Eastman Kodak Co., et al.*, No. 1:20-cv-06861-JGK (S.D.N.Y.).

[116] *See In re Eastman Kodak Co. Secs. Litig.,* No. 6:21-cv-06418-EAW (W.D.N.Y.).

109.    The NYAG also commenced an investigation into Continenza's June Trades.[117]  As part of its investigation, the NYAG served Kodak with a subpoena on November 25, 2020.[118]  On June 2, 2021, the NYAG filed its *Ex Parte* Application in the NYAG Action, stating it has determined to file a claim against Kodak and Continenza under the Martin Act, and seeking additional discovery from Kodak, while citing and quoting in its papers discovery it has already obtained.[119]  On June 15, 2021, the New York Supreme Court granted the *Ex Parte* Application, ordering Kodak to produce documents from Continenza, Bullwinkle, Byrd, Gutkin, Kodak's Chief Accounting Officer Richard Michaels, and Taber, and Byrd and Continenza to testify publicly on September 24 and October 1, 2021, respectively.[120]

## THE SPECIAL COMMITTEE WHITEWASH

110.    On August 6, 2020, in the midst of public scrutiny, the Board formed the Special Committee to investigate Continenza's June Trades, the July 2020 options awards, and Karfunkel's "charitable donation" of Kodak stock.[121]

111.    The Special Committee published the results of its investigation on September 15, 2020.  In its Report, the Special Committee concluded that none of Kodak's Board members did anything wrong.  As described at length herein, the Special Committee failed to "determine[] in good faith, after conducting a reasonable inquiry upon which its conclusions are based, that the maintenance of the derivative proceeding is not in the best interest of the corporation."  N.J.S.A. 14A:3-6.5(1)(a).

---

[117] Novack Aff. ¶ 9.

[118] NYAG Action Order at 3.

[119] Novack Aff. ¶ 6.

[120] NYAG Action Order at 2-3.

[121] Report at 6.

112.    The Special Committee concluded that when Continenza bought Kodak stock on June 23, 2020, he did not have MNPI because the DFC Loan negotiation process was "too speculative" at that time, and because Byrd pre-cleared Continenza's trades in accordance with Company policy.  It concluded that the July 27, 2020 option grants were proper because Byrd was unaware of the Company's prohibition on springloading stock options, and the options were not granted with the intention of taking advantage of the Company's imminent stock price increase. And it concluded that Defendant Karfunkel's tax fraud scheme was not provable, despite deciding not to seek documents from Karfunkel or his charitable foundation.

113.    None of these conclusions were reasonable.  None reflect the good faith business judgment of independent directors.  All of these conclusions also beg important, unanswered evidentiary questions that should be answered prior to any determination of the validity of the Special Committee's conclusions.

### A.    The Special Committee's Bogus Conclusion that Continenza Did Not Have MNPI When He Bought Kodak Stock on June 23, 2020

114.    The Special Committee concluded that when Continenza decided to purchase 46,737 shares of Kodak stock on June 23, 2020, he did not have MNPI because (1) "before the July 22, 2020 site visit where Kodak was informed for the first time about the [DFC] LOI, Kodak's management, including Continenza, believed that Kodak's efforts to obtain a loan from the government had a low probability of success"[122]; and (2) Continenza acquired the shares during an open Window Period and received pre-clearance from Byrd in accordance with Company policy.  This conclusion is unsupported by the facts.

---

[122] *Id.* at 65.

1.    **Numerous Signs Prior to Allal's Site Visit Pointed to the Likelihood of Kodak's Success in Obtaining the DFC Loan**

115.    The Special Committee's conclusion that Continenza did not have MNPI when he made the June Trades because he believed when he made the trades that Kodak "had a low probability of success" in obtaining the DFC Loan cuts against all reasonable inferences.

116.    As of June 23, 2020, Continenza had been engaged in an intense, months-long dialogue with senior government officials that were filled with positive signs.  When Continenza pitched Kodak's request for $27 million in government funding on May 22, 2020, Navarro told him to "think bigger," and asked for a "well-fleshed out" proposal within a week.[123]  When Continenza pitched a plan for $435-$575 million in government funding on May 28, 2020, Navarro asked for a "more thorough proposal" by June 3, 2020.[124]  Then, on May 31, Abbott fulfilled his May 22 promise to help Kodak get a non-recourse loan by putting Kodak directly in touch with the DFC.  The DFC then invited Continenza and Phlow to participate in a conference call on June 1, 2020 in which "DFC personnel walked Kodak through the agency's loan application process."[125]

117.    The Special Committee makes much of Navarro's canceling a June 4, 2020 meeting he had scheduled with Continenza to discuss Kodak's latest proposal.[126]  Continenza told the Special Committee he took the cancellation as "a particularly bad sign."[127]  But there was no longer a need for Kodak to meet with Navarro on June 4.  The Report notes that Abbott redirected Kodak to discuss its latest proposal with the DFC instead of Navarro, which was reasonable considering

---

[123] *Id.* at 18.

[124] *Id*.

[125] *Id.* at 19.

[126] *Id.* at 20.

[127] *Id*.

that it was the DFC would be issuing any loan, not Navarro, and Kodak was already in touch with the DFC at that time.[128]  Moreover, "Abbott [another high-ranking government official] continued to be in contact with Kodak."[129]  Further, if Continenza took this meeting cancellation as a "particularly bad sign," his and Kodak's actions were not consistent with his pessimism:

(a)    While struggling financially during the pandemic, including furloughing employees,[130] Kodak paid Everglade over $350,000 in June 2020 alone;[131]

(b)    Continenza caused Kodak to sign letters of intent with Phlow on June 8 and June 15, 2020,[132] and sent the June 15 LOI to the DFC as part of its loan application;

(c)    On June 8, 2020, Taber told a colleague that the DFC Loan application was "going well";[133]

(d)    Bullwinkle told a colleague on June 15, 2020 that he was "Optimistic yes!" about the loan application process;[134]

(e)    Kodak submitted its preliminary loan application on June 16, 2020,[135] and that same day, a DFC representative contacted Continenza to say "he heard things were 'moving along which is great'";[136]

(f)    Continenza told his administrative assistant on June 17, 2020 that things were "[v]ery" good after his calls with the White House the prior evening, because Kodak was "still in it";[137]

(g)    On June 18, 2020 Kodak sent the June 18 Email to Project Tiger team members telling them the Project may constitute MNPI;

---

[128] *Id.*

[129] *Id.*

[130] *Id.* at 13.

[131] Novack Aff. ¶ 17.

[132] Report at 16, 21.

[133] Novack Aff. ¶ 19.

[134] *Id.* ¶ 25.

[135] Report at 21.

[136] *Id.* at 22.

[137] Novack Aff. ¶ 27.

(h)     Also on June 18, 2020, Continenza emailed Phlow's CEO Edwards and wrote that he "[l]ook[ed] forward to building an alliance together for all of America";[138]

(i)     Continenza had Project Tiger team members working on Kodak's financial model for the loan application over the June 20, 2020 Father's Day weekend;[139]

(j)     The same day that Continenza made the June Trades, he rewarded Project Tiger team members $30,000 of bonuses for their hard work;[140] and

(k)     In connection with its June 26 final loan application, Kodak forecasted dedicating 30% to 40% of its facilities to its pharmaceuticals business, which it expected to be profitable by 2025.[141]  It is reasonable to infer Continenza was aware of these projections when he made the June Trades on June 23, 2020.

118.   The Special Committee also unreasonably credited Continenza's purported concern that the DFC representative Allal who was assigned to handle Kodak's loan was "not as senior as the government officials that Kodak had been interacting with previously," which Continenza says he felt was a "negative development."[142]   But Allal's assignment to the matter was equally consistent with the conclusion that the "senior" officials had passed the due diligence process off to Allal after concluding they were in favor of moving forward.  This is exactly what happened: Abbott connected Kodak to the DFC, and then after Kodak submitted its application, Allal led the due diligence process for the next two weeks before asking to set up a site visit.

---

[138] *Id.* ¶ 30.

[139] *Id.* ¶ 31.

[140] *Id.* ¶ 37.

[141] *Id.* ¶¶ 43, 44.

[142] Report at 21.

119.    Moreover, Continenza told the Special Committee that "he was committed to Kodak entering the pharmaceutical manufacturing space with or without government assistance,"[143] which would have been MNPI anyway.

120.    The Special Committee credited Continenza's convenient exculpatory statement that nobody at Kodak believed they were going to get the DFC Loan until the "dramatic turning point" on the very day that they found out they were approved, i.e., on July 22, 2020:

> Almost every witness . . . identified the July 22, 2020 site visit as an important and dramatic turning point in the discussions with the DFC. The witnesses consistently stated that, prior to the site visit, and even up to the day of and during most of the visit (for those who participated), they viewed the loan application as having a low likelihood of success. This changed once the DFC stated that it wanted to enter into an LOI with Kodak. Numerous witnesses expressed surprise at the rapid decision-making and the abrupt turn of events.[144]

The Special Committee's willingness to endorse the fiction that the DFC Loan was a total longshot until the minute they found out they obtained the loan is evidence of their bad faith.  This story not only ignores the above list of positive signs—most of which, as discussed further below, were omitted form the SC Report and only unearthed by the NYAG—but allows them to conclude, against common sense, that none of the information about the DFC Loan at the time of Continenza's June 23, 2020 stock purchases would be MNPI.  Indeed, under the Special Committee's logic, Continenza could just as safely have bought his shares the morning of July 22, 2020, just hours before Allal informed him the DFC Loan had been approved.

---

[143] *Id.* at 20.

[144] *Id.* at 27.

2. **The Special Committee Diminished Phlow's Significance and Positive Impact on the Loan Application Process**

121.   The Special Committee Report paints Phlow as a minor player in Kodak's efforts to obtain the DFC loan.  In reality, considering Phlow's $812 million contract with BARDA to manufacture medicine to treat COVID-19 patients, Phlow played a significant role shepherding Kodak's loan negotiations and giving Kodak's loan application credibility with the DFC.  This is precisely why on June 18, 2020, Continenza thanked Edwards "100% for everything you are doing."[145]

122.   Phlow's $812 million contract with BARDA was for Phlow to "manufacture raw ingredients in the US for drugs needed to treat COVID-19 patients," and would enable Phlow to "work with private-sector partners"[146]—like Kodak—to do so.  That contract—"one of the largest sums ever awarded by [BARDA]," which connected Kodak to Phlow, was facilitated by Navarro, the same government official that Phlow introduced to Kodak.[147]  Phlow, in the midst of its own negotiations with the government, introduced Kodak to Navarro and participated in the initial call between Kodak and Navarro on April 2, 2020.[148]  Phlow's contract was announced on May 19, 2020, just days before Kodak made its first proposal to Navarro.[149]  Three days after Phlow was awarded the BARDA contract, Navarro told Kodak to "think bigger" and submit a new proposal,

---

[145] ¶ 55, *supra*.

[146] Melissa Quinn, *Trump administration signs deal with Virginia company to manufacture COVID-19 medicines*, CBS NEWS (May 19, 2020, 10:54 AM), https://www.cbsnews.com/news/coronavirus-treatment-medicine-phlow-corporation-345-million-deal-government/.

[147] Porter, *supra* at n.14.  Phlow submitted its proposal to the government in March 2020.  *Id.*

[148] Report at 16.

[149] Quinn, *supra* at n.146.

and Abbott suggested that Phlow assist Kodak with the details.[150]  And when the DFC scheduled its first call with Kodak for June 1, 2020, Phlow's CEO Edwards was invited to participate.[151]

123.    Although the Special Committee acknowledged that Phlow was "knowledgeable about whom to speak to in the government and how," the Special Committee diminished the impact of Phlow's influence on the negotiations by burying any reference to Phlow's $812 million BARDA contract in footnote 44 of a 560-footnote SC Report.[152]  And, even then, footnote 44 is based on "public reports," as opposed to non-public information gathered as part of the Special Committee's investigation.

124.    Likewise, the Special Committee credited Byrd and Bullwinkle's purported concern that the loan application was unlikely to be granted because it was "only supported by a single proposed off-take agreement" (i.e., the Phlow LOI).[153]  In reality, the Phlow LOI represented that Kodak had secured a major, federally-backed customer for its KSMs and APIs that would (1) inspire confidence in the DFC about Kodak's ability to repay the loan, and (2) incite the DFC to grant the loan because it would, in part, facilitate Phlow's $812 million contract with BARDA. Kodak, in fact, leveraged its relationship with Phlow, as well as Phlow's contract with BARDA, by enclosing the Phlow LOI as part of its loan application.  Thus, a more reasonable inference is that Kodak believed its loan application was likely to succeed because it was supported by Phlow.

125.    Moreover, Phlow's decision to execute the Phlow LOI reflects Phlow's belief, based on its direct participation in Kodak's conversations with the government, that Kodak would likely receive the DFC Loan.  Phlow's decision to execute the Phlow LOI on June 15 therefore

---

[150] Report at 18.

[151] *Id.* at 19.

[152] *Id.* at 15 n.44.

[153] *Id.* at 24 & n.142.

undercuts Continenza's claim that on June 23, 2020 he thought Kodak's loan application had a low probability of success.

126.   Further, the Phlow LOI could have itself constituted MNPI.  Kodak's internal trading policy includes as illustrative examples of MNPI "[n]ew major contracts, orders, supplies [or] customers[.]"[154]  In addition, as Continenza told the Special Committee, "he was committed to Kodak entering the pharmaceutical manufacturing space with or without government assistance,"[155] which was itself MNPI, and the Phlow LOI would enable him to do.

### 3.   The Special Committee Unreasonably Concluded that Continenza Precleared the June Trades in Accordance with Company Policy

127.   The Report credits the fact that "Continenza received preclearance from Byrd in accordance with Company policy"[156] as evidence that Continenza did not have MNPI at the time of the June Trades.[157]  Company policy, however, required Continenza to (1) request pre-clearance from Byrd *via email* at least *one day before* the June Trades, and (2) receive a response that the trades were permissible.  The NYAG's investigation found no evidence of either.[158]  Continenza's June Trades were therefore not "in accordance with Company policy."  The Special Committee's contrary conclusion is evidence of its bad faith.

128.   Moreover, while both Continenza and Byrd now conveniently claim over one year after the June Trades that Byrd pre-cleared the trades during a phone call on or in the days preceding June 23, 2020, neither can recount the details of the discussion, and the phone call is not

---

[154] *Id.* at 36.

[155] *Id.* at 20.

[156] *Id.* at 40.

[157] *Id.* at 41; *see also id.* at 65.

[158] Novak Aff. ¶ 35.

memorialized in an email or elsewhere.[159]  In addition, Byrd did not memorialize his purported analysis, which should have occurred before the trades, that the transactions were "permissible."

129.    Despite this lack of corroborating evidence, the Special Committee exonerated Continenza by relying on Byrd's memory that Byrd precleared the June Trades because he "concluded that Continenza did not have MNPI because the outcome of the DFC application was uncertain."[160]  Numerous facts contradict Byrd's post hoc rationalization.

130.    First, as noted above, the Company *acted* like, and received a slew of signs from reputable sources, that a positive outcome was likely.  The Special Committee also found that Byrd "had a firm grasp of the information that was available to the Company regarding the status of the DFC loan application at the time he precleared the trades."[161]  Indeed, Byrd was part of Project Tiger's Executive Review and Management team.[162]

131.    Second, Byrd acted consistent with knowing that Project Tiger was MNPI. Kodak's Policy against insider trading requires that all "[i]ndividuals who are cleared for special 'coded' projects *that are deemed MNPI by [Byrd]*" are to be included on an "Insider List."[163] During its investigation, the Special Committee learned that at least some individuals on Project Tiger's clearance list were also on the Insider List.[164]  Project Tiger was thus "deemed MNPI by [Byrd]."

---

[159] *Compare* Report at 65 *with* Novack Aff. ¶ 35.

[160] Report at 40.

[161] *Id.* at 3.

[162] Novack Aff. ¶ 22.

[163] Report at 35–36 (emphasis added).

[164] *Id.* at 38-39.

132.     Third, Byrd was likely the executive that directed the Company to send the July 18 Email to all Project Tiger team members warning them that Project Tiger may constitute MNPI. The SC Report explains that the June 18 Email was sent pursuant to the Insider List Governance Policy that Byrd's Office of the Corporate Secretary maintains.[165]  Byrd cannot credibly claim that Project Tiger may have constituted MNPI as of June 18, but not June 23, 2020.

133.     Fourth, Byrd's purported decision to preclear the June Trades contradicts his decision to *not* preclear Continenza's trades just three months prior "in light of the 'materiality to the company' of a deal of significantly *smaller* magnitude and of *less* salience than the DFC loan."[166]

134.     Fifth, Byrd's statement that Project Tiger was not MNPI because "it was uncertain what impact the news of Kodak taking on such a large amount of debt would have on the stock price"[167] is undermined by the fact that (1) Kodak forecast that the project would generate positive cash flow and EBITDA by 2025, and (2) Continenza told the whole world on *Squawk Box* that the project would be profitable and "very competitive."   In addition, Byrd's statement that the Board did not know how Kodak's stock price would react to the DFC Loan is belied by common sense. Kodak's stock had been languishing below $3 per share.  News that Kodak would be entering the pharmaceutical industry with nearly $800 million of government money was highly likely to move the market in a positive direction, and everyone on Kodak's Board knew it.  That is why they rushed to meet on July 27, 2020 to grant stock options.  Indeed, the SC Report notes that "most of

---

[165]*Id*.

[166] Novack Aff. ¶ 36 (emphasis added).

[167] Report at 42.

the witnesses viewed the LOI as positive news that would probably cause Kodak's stock price to rise[.]"[168]

135.    Moreover, Byrd cannot claim, out of one side of his mouth, not to know what effect the DFC Loan would have on Kodak's stock price, while out of the other side of his mouth admit that Kodak needed to issue the July 27, 2020 stock options before the DFC LOI was announced, "while its stock price was trading below the lowest strike price of $3.03 per share."[169]

136.    The Special Committee's reliance on Byrd is also inconsistent with its separate conclusion regarding the July 27, 2020 option grants, in which the Special Committee "identif[ied] several flaws in the process that Kodak's General Counsel followed with respect to th[ose] grants."[170]  The Special Committee cannot both rely on Byrd's judgment to insulate Continenza's June 23, 2020 trades, and also blame Byrd's incompetence as the reason the Board did not understand why it could not grant options one day before market-moving news.

137.    Finally, the Special Committee also concluded that Continenza's stock purchases were inconsistent with a finding of scienter because, among other things, the trades were "during an open trading window."[171]  In fact, Continenza made his purchases on the very last day of a Window Period that extended from May 15, 2020 to June 23, 2020.[172]  A more reasonable interpretation of the timing of Continenza's stock purchases is that he waited as long as he possibly could, amassing as much information as he could about the status of the DFC Loan negotiations, before he decided to buy his shares.

---

[168] *Id.* at 75.

[169] *Id.* at 55-56.

[170] *Id.* at 3.

[171] *Id.* at 65.

[172] *Id.* at 39-40.

4. **The Special Committee's Conclusion Regarding Kodak's Insider List Contradicts Its Conclusion about the June Trades**

138.    Kodak's Policy against insider trading required that all "[i]ndividuals who are cleared for special 'coded' projects *that are deemed MNPI by [Byrd]*" are to be included on an "Insider List."[173]  Folks on the Insider List receive the Insider Memo, as well as notification from Byrd when Kodak's Trading Window for transacting in Kodak stock opens and closes.

139.    During its investigation, the Special Committee learned that some, but not all, individuals on Project Tiger's clearance list were also on the Insider List.[174]  The Special Committee recommended that Kodak "review and update its processes to . . . include relevant individuals on the Insider List once placed on coded projects."[175]  Stated differently, the Special Committee recommended that the Insider List include all individuals on Project Tiger's clearance list.  This recommendation implies that folks on Project Tiger's clearance list had access to MNPI, and is inconsistent with the Special Committee's conclusion that Project Tiger was not MNPI when Continenza made the June Trades.  This further implies that the Special Committee did not find the Company's admonition in the June 18 Email sufficient that Project Tiger could constitute MNPI "from time to time."[176]  Otherwise, Project Tiger team members would not need to be added to the Insider List.  They would only belong on the Insider List if Project Tiger was a "special 'coded' project[] that [was] deemed MNPI by the Corporate Secretary."[177]

---

[173] *Id.* at 35–36 (emphasis added).

[174] *Id.* at 39-40.

[175] *Id.* at 80.

[176] ¶ 57, *supra*.

[177] Report at 36.

5.     **The NYAG's Decision to Prosecute Kodak and Continenza under the Martin Act Undermines the Special Committee's Conclusion**

140.    Plaintiff is not the only one who views the Special Committee's conclusion as lacking good faith. *After* the SC published its Report, on November 25, 2020, the NYAG served a subpoena on Kodak seeking documents concerning Continenza's June 2020 Purchases.[178] Then, on June 1, 2021, after receiving and reviewing documents responsive to the subpoena,[179] the NYAG instituted the NYAG Action, stating that it has determined to commence an action against Kodak and Continenza under the Martin Act.[180]

B.     **The Special Committee's Bogus Conclusion that the July 27, 2020 Springloaded Options Were Properly Granted**

141.    With regard to allegations that the CNG Committee improperly granted springloaded options on July 27, 2020, the Special Committee's main conclusions were:

1)     "The grants – and in particular the grant to Continenza – had been discussed with the Board well in advance of the start of the DFC loan application process";

2)     The grants "were awarded for legitimate business purposes unrelated to the DFC Announcement";

3)     Option springloading "can only give rise to state law breach of fiduciary duty claims under certain circumstances not present here";

4)     "Kodak's Board and the CNG Committee were not warned that the timing of the grants could give rise to concerns about so-called options 'spring loading'";[181] and

5)     "[T]here was no expectation at the time of the grant that the grantees would experience a massive windfall based on the DFC Announcement."[182]

---

[178] NYAG Action Order at 3 & n.1.

[179] *See*, *generally*, Novack Aff.

[180] *Id.* ¶ 6.

[181] Report at 3.

[182] *Id.* at 76.

None of the Special Committee's rationalizations for this misconduct pass muster.

> **1.  Continenza's Expectation of Additional Options at Some Future Date Does Not Explain the Board's Decision to Grant Him (and Others) Springloaded Options on July 27, 2020**

142.   The Special Committee exhaustively detailed the history of Continenza's compensation scheme.[183]  The Report represents that Continenza had been in conversation with the CNG Committee about granting him additional stock options for several months prior to the DFC Loan negotiations.  To grant him additional options, however, Kodak needed to amend its Executive Compensation Plan (the "Amended Plan").  In its 2020 Proxy, Kodak successfully solicited stockholders to approve the Amended Plan at Kodak's May 19, 2020 annual meeting.  Thus, the Special Committee notes:

> The July 27, 2020 Board meeting was in fact the first Board meeting when company management was in a position to propose the grant after the Executive Compensation Plan was amended. Thus, the evidence credibly demonstrates that the decision to present the options for approval at the July 27, 2020 Board meeting was not driven by the imminent DFC Announcement, but was instead the culmination of Kodak's long-standing [plan] . . . .[184]

143.   This argument is a non sequitur.  Even *if* the Board contemplated granting Continenza additional shares, the July 27, 2020 Board meeting was only scheduled after the Board knew about the DFC Loan.  Had it been scheduled for two days later, the nonpublic information about the DFC Loan would have become public, and there would have been no issue of springloading.  The Board's decision to schedule the meeting and grant stock options when they all ***knew*** they had MNPI cannot be rationalized as being their "first" opportunity to do something they had planned all along.

---

[183] *Id.* at 44-50.

[184] *Id.* at 75.

144.    The Special Committee also considered whether the 2020 Proxy needed to disclose the Board's purported prior discussions with Continenza about granting him additional shares, and concluded it did not because "[t]he informal internal discussions regarding the mechanics of how [Continenza's] grant[] would be structured"[185] were immaterial.  The Special Committee cannot in good faith conclude that, on the one hand, the July 27, 2020 option grants were not springloaded because the Board was already planning on awarding Continenza additional options, while on the other hand, the 2020 Proxy need not disclose the Board's discussions with Continenza because they were "informal" and the "mechanics" of his grant had not been worked out.  The SC's flip-flopping is evidence of its bad faith.

145.    Moreover, the word "and" in the Special Committee conclusion, quoted in paragraph 139 above, that "The grants – ***and*** in particular the grant to Continenza – had been discussed with the Board well in advance of the start of the DFC loan application process," falsely implies that option grants to ***other*** Option Recipients ***besides Continenza*** had been discussed previously.  Nothing in the Report supports that conclusion.  Rather, it appears that the decision to grant the other Option Recipients' stock options was made sometime in the five days between the DFC Loan approval on July 22, 2020 and July 27, 2020, when they were granted.

### 2.    The Springloaded Options Were Not "Awarded for Legitimate Business Purposes Unrelated to the DFC Announcement"

146.    The Special Committee's main conclusion about the springloaded options is that they were not granted with any intention of unjustly benefiting the Option Recipients.  This conclusion asks Plaintiff, and the Court, to accept the view that these options were granted in the ordinary course of business.  The facts say otherwise.

---

[185] Report at 70.

147.    First, the SC Report pretends that the Board met on July 27, 2020 for a reason other than granting springloaded options.  The Report explains that "[b]oth Byrd and Continenza felt it was prudent to update the Board regarding the LOI prior to the DFC Announcement, and determined that a Board call should be scheduled to discuss the LOI and seek approval of the options grants."[186]

148.    There was no reason to schedule an emergency board meeting to "discuss the LOI." By July 27, 2020, Continenza was already set to meet with government officials for a public event the next afternoon.  Continenza had already been interviewed by *The Wall Street Journal* for an article slated to run the next morning.  Nonetheless, the Report notes that after management presented its materials, "all of the directors present indicated that they were in favor of Kodak moving forward" with the DFC Loan.[187]  This is lucky indeed, for it would have been very embarrassing to have had to cancel all the press events for the next day if the Board had not so voted.

149.    The real reason the Board scheduled a telephonic meeting for July 27, 2020 was to issue stock options before Kodak's stock price jumped the next day.  On July 27, 2020, Kodak's stock closed at $2.62 per share.  According to the SC Report:

> Several witnesses, including Byrd, also recognized that to grant the options under the contemplated structure, the Company would need to do so while its stock price was trading below the lowest strike price of $3.03 per share.  If the stock price went above $3.03 per share then the entire structure of the options grants would need to be changed since the Executive Compensation Plan prohibited "in the money" options grants (*i.e.*, grants that were immediately

---

[186] *Id.* at 50.

[187] *Id.* at 50-51.

exercisable because the strike price was lower than the trading price at the time of the grant).[188]

150.     The SC Report does not say when the July 27, 2020 meeting was scheduled.  The meeting appears to have been scheduled relatively last-minute.  One of the three CNG Committee members charged with authorizing the option grants (Defendant Bradley) had to leave the meeting "to avoid missing a previously scheduled flight,"[189] and had to give his voting proxy to Defendant Katz.  Defendant Byrd, Kodak's General Counsel, did not even have time to finish his PowerPoint slides outlining the proposed option grants.[190]

### 3.     The Springloaded Options Were Granted In Violation of State Law

151.     Kodak is a New Jersey corporation, and thus New Jersey law likely governs the question of whether the July 27, 2020 stock options were lawfully granted.  The Special Committee reasonably concluded, however, that New Jersey law had not addressed this question, and thus turned to Delaware law, which it found was "most developed" on this question.[191]

152.     The "seminal" Delaware case explaining stock option springloading is *Tyson Foods*.[192]  *Tyson Foods* sets out a two-part test:

> First, a plaintiff must allege that options were issued according to a shareholder-approved employee compensation plan. Second, a plaintiff must allege that the directors that approved spring-loaded . . . options (a) possessed material non-public information soon to be released that would impact the company's share price, and (b) issued those options with the intent to circumvent otherwise valid

---

[188] *Id.* at 55-56.

[189] *Id.* at 51.

[190] *Id.*

[191] *Id.* at 72.

[192] *Id.* at 73 (citing *Tyson Foods*, 919 A.2d at 592-93).

shareholder-approved restrictions upon the exercise price of the options.[193]

153. The Special Committee concluded that the July 27, 2020 stock options were not granted with an "intent to circumvent the intent of the Plan."[194]  Rather, the Special Committee explains, the July 27, 2020 Board meeting was the "first" opportunity they had to grant options to Continenza, to whom they had previously promised to give additional options at some future date. As noted above, this circular logic does not excuse the Board's decision to choose July 27, 2020 as the date to grant those options, while knowing that they were in possession of MNPI.  It also does not excuse their decision to grant options to **other** Option Recipients on that same date.

154. Again, the Board did not have to grant stock options on July 27, 2020.  If the Board felt it needed to meet that day to discuss the next day's DFC Loan announcement, they were free to do so.  Their separate decision to grant stock options was unrelated and entirely unnecessary. Instead, if they had waited just a few more days until the news of the DFC Loan had been absorbed by the stock market, the stock options would have been entirely legitimate.

155. Of course, Continenza and the other Option Recipients did not **want** to wait until the MNPI about the DFC Loan had already been released to the market.  This would have meant that their options would have needed to be granted at higher prices, and would have been worth less to them.  Facing this choice, the Board and the CNG Committee chose to enrich Continenza and the other Option Recipients, at Kodak's expense.

---

[193] *Id.* at 74.

[194] *Id.* at 75.

4.      **Byrd's Failure to "Warn" the Board Does Not Excuse Their Decision to Grant Springloaded Options**

156.    While the Special Committee rejected the conclusion that the July 27, 2020 options were ***actually*** springloaded, it acknowledged that the options ***looked*** like they were springloaded. As the Special Committee wrote: "we do have concerns with Byrd's failure to raise the risk that the grants could be ***perceived*** as spring-loaded options, even if that was not the intent."[195]

157.    The Special Committee placed blame squarely on Byrd for his failure to advise the Board about the terms of the Plan and the Policy.  Specifically, Byrd should have known about, and advised the Board about, the Policy's prohibition on manipulating the "timing" of equity grants:

> As described above, there is a lengthy body of Delaware case law that indicates that, under some circumstances, granting options shortly before a positive news announcement could subject a company and its officers and directors to liability. This case law is likely the reason why Kodak adopted the "Timing of Public Announcements" provision in the Executive Compensation Policy in 2014. While we credit Byrd's claim that he wasn't aware of the "Timing of Public Announcements" provision, by February 2020 he knew that the Company had an Executive Compensation Policy and failed to fully review it before presenting a substantial grant proposal to the CNG Committee. In addition to overlooking the policy, Byrd failed to identify the case law that indicates the risks associated with options grants that can raise the perception of spring loading. All of this deprived the Board and the CNG Committee of the ability to make an informed judgement as to whether the grants would subject the Company to risks of costly litigation, regardless of whether any potential claims were likely to succeed at the end of the day.[196]

158.    The Special Committee seems to have given little consideration to the fact that Byrd had a personal financial motive ***not*** to advise the Board about the possibility that the options were

---

[195] *Id.* at 76 (emphasis added).

[196] *Id.* at 76-77.

unlawful.  At the July 27, 2020 meeting where he explained the proposed stock option grants, he was lobbying for himself to receive 45,000 stock options.

159.    Byrd in fact ***admitted*** that he knew the July 27, 2020 stock options could raise "optics" concerns, but only "if the [DFC Loan] announcement triggered a substantial increase in Kodak's stock price."[197]  Byrd claimed, however, that "he was unsure how Kodak's stock price would react to the DFC Announcement and he never imagined that it could increase as exponentially as it did."[198]  Byrd's testimony on this point is obviously self-interested and false. Byrd was in such a rush to get the stock options approved on July 27, 2020, that he was unable to finish preparing his presentation materials.[199]  He also ***admitted*** that he needed to get the options approved on July 27, 2020 ***before the stock price went up the next day***:

> Several witnesses, including Byrd, also recognized that to grant the options under the contemplated structure, the Company would need to do so while its stock price was trading below the lowest strike price of $3.03 per share.[200]

160.    The entire Board clearly understood that the DFC Loan was a big deal and would cause Kodak's stock price to soar.  The entire Board was informed on July 27, 2020 of Kodak's financial projections and business plan in connection with Project Tiger.[201]  Moreover, the entire Board was interviewed by the Special Committee, which stated in its Report that "most of the witnesses viewed the LOI as positive news that would probably cause Kodak's stock price to rise[.]"[202]  Each of the Board members, but especially the members of the CNG Committee, were

---

[197] *Id.* at 52.

[198] *Id.* at 52-53.

[199] *Id.* at 51.

[200] *Id.* at 55-56.

[201] ¶ 67, *supra*.

[202] Report at 75.

charged with understanding the basic terms of the Plan and the Policy.  The fact that their self-interested General Counsel did not tell them what they were already required to know does not excuse their misconduct.

### 5. Continenza Told the Whole World that Kodak Could "Bank" on the DFC Loan and that Kodak's Pharmaceuticals Business Would Be Profitable

161.    The Special Committee concluded that the options were not springloaded because "no one anticipated the massive price increase that occurred in the wake of the DFC Announcement,"[203] which "is startling when one considers that it was based on news that Kodak had signed a non-binding Letter of Interest to apply for a potential loan."[204]  The "dramatic increase" in Kodak's stock price, however, came after Continenza's *Squawk Box* appearance.

162.    Continenza told the entire world on CNBC's *Squawk Box* before the market opened on July 29, 2020 that Kodak was "very comfortable that we can bank" on the loan, and was "gonna get to the end game."  Continenza also stated that Kodak's pharmaceuticals business would not only be profitable, but would constitute 30% to 40% of Kodak's business over time.  After closing at $7.94 per share on July 28, 2020, the stock price opened at $18.43.  Then, while Continenza reiterated to *Fox Business News* and *Yahoo! Finance* that the pharmaceuticals project would be profitable, Kodak's stock traded at a high of $60 and closed at $33.20 on July 29.  Thus, the Special Committee ignores that the "massive price increase" in Kodak stock appears to have been "based on" Continenza's public statements.  Moreover, given his role as Executive Chairman and CEO, Continenza would have informed the Board and CNG Committee of his views on July 27, 2020.

---

[203] *Id.* at 75-76.

[204] *Id.* at 75.

163.    In addition, the fact that the CNG Committee did not know by how much Kodak's stock price would rise does not excuse the fact that they knew Kodak's stock price "would probably"[205] rise upon the LOI's announcement.  The CNG Committee's inability to predict by how much the stock price would rise is precisely why they should have waited to award the options.

### C.    The Special Committee's Nonsensical Conclusion that Defendants Did Not Violate Section 10(b) of the Exchange Act by Springloading Options

164.    The Special Committee considered whether Defendants' springloading options scheme violated Section 10(b) of the Exchange Act.  The SC concluded that it did not because (1) a federal district court held in *Bono v. O'Connor*,[206] that company insiders did not violate Section 14(a) of the Exchange Act by failing to disclose a purported springloading options scheme in a proxy;[207] (2) no false or misleading disclosures were issued to stockholders; and (3) Byrd did not raise any disclosure concerns in connection with the option awards.[208]  The SC's analysis of these issues was unreasonable.

165.    First, *Bono* is wholly distinguishable.  *Bono* considered violations of Section 14(a), not Section 10(b), which have different legal standards and rules.  Specifically, *Bono* considered whether statements to **stockholders** in a proxy violated Section 14(a) and thereby harmed the company, not whether, as is relevant here, statements to a **company** that **issued securities in reliance on those statements** violated Section 10(b).  Moreover, the *Bono* plaintiff pled no facts establishing the defendants knew positive disclosures were about to be issued, whereas here the

---

[205] *Id.*

[206] No. 15-6326 (FLW)(DEA), 2016 WL 2981475, at *7-10 (D.N.J. May 23, 2016).

[207] Report at 69-70.

[208] *Id.* at 71.

Report concedes: "the grants were not issued until ***after*** the Board was given ***complete information*** regarding the LOI[.]"[209]

166.     Second, the Special Committee's conclusion focuses on Defendants' disclosures to ***stockholders***, as opposed to Defendants' disclosures ***to the Company***.[210]   Under relevant federal law, however, Defendants' disclosures ***to Kodak***, which issued the springloaded options, is central to a derivative Section 10(b) claim.   For example, in *In re Zoran Corporation Derivative Litigation*,[211] a federal district court found that defendants violated Section 10(b) in connection with backdating options[212] because defendants misrepresented to the company ("Zoran") that:

> [S]tock options were being granted at fair market value and [] the options were accounted for properly.  ***Zoran then relied on these misrepresentations (including the bogus paperwork) in making stock-option grants to officers and directors***.  It suffered harm because those options should have fetched the higher price associated with the true grant date. This is not like the typical case where the victim is a purchaser. Here, ***the victim is the seller***, defrauded into parting with its shares at a lower price than was right. Still, the 1934 Act covers such transactions. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151–53, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).[213]

167.     Here, like in *Zoran*, Kodak relied on Defendants' misstatements that the options were being awarded at fair market value and accounted for properly.  Instead of taking guidance from cases such as *Zoran*, however, the SC concluded that backdating "differs substantially from so-called options 'spring loading,'" although the SC admitted that backdating "is clearly

---

[209] Report at 71 (emphasis added).

[210] *See id*.

[211] 511 F. Supp. 2d 986 (N.D. Cal. 2007).

[212] "Backdating" refers to a practice of granting options that are dated before the actual issuance, on a date when the company's stock price was lower.  This enables the recipient to receive options with a strike price that is lower than the company's stock price on the date of the grant.

[213] *Zoran*, 511 F.Supp.2d at 1011 (emphasis added).

illegal[.]"[214]  Backdating, however, like springloading, enables stock options to be granted "in the money" while appearing not to be so.

168.    Third, the Special Committee's conclusion that no "false and misleading statements were made with scienter" because Byrd raised no disclosure concerns when the options were issued is illogical for the same reasons alleged in paragraphs 153-157 herein.

**D.    The Special Committee's Decision to Dodge the Question of Karfunkel's Tax Fraud**

169.    The Special Committee examined "[w]hether Board member George Karfunkel violated the federal securities laws or Kodak's internal policies and procedures by donating 3 million Kodak shares to an affiliated charity the day after the DFC Announcement, while the Company's trading window remained closed."[215]  The Special Committee concluded that Karfunkel did not violate any securities laws or any Company policies.[216]  It only found that "the circumstances of the gift raise significant concerns from a corporate governance perspective."[217]

170.    The SC Report relied exclusively on Karfunkel's interviews instead of gathering documentary support, which should have been readily available.  According to the SC Report, the Special Committee's "ability to fully investigate the *bona fides* of the gift or the charity that received it was limited because we did not have access to the records of the charity and were unable to interview any of its officers or directors, with the exception of Karfunkel."[218] Importantly, this means Karfunkel did not comply with the Special Committee's investigation

---

[214]  Report at 69.

[215]  *Id.* at 2.

[216]  *Id.* at 67.

[217]  *Id.* at 3-4.

[218]  *Id.* at 3, n.2.

and refused to provide documents or witnesses to corroborate his story. Besides breaching his duties as a director to comply with an internal investigation, Karfunkel's failure to comply should have caused the Special Committee to intensely scrutinize this transaction.

171.   Additionally, there are many other reasons for the Special Committee to doubt the credibility of Karfunkel's statements and the basis of the SC Report's conclusions.

172.   When discussing the permissibility of the transaction during a blackout period, the SC Report explains that "Karfunkel did not believe that the gift was impermissible either under Kodak's policies or as a legal matter, even though Kodak's trading window was closed."[219]   Karfunkel did, however, confide in Byrd regarding the permissibility of trading or donating shares during the closed trading window.

173.   The Special Committee was on notice that Karfunkel had likely backdated his charitable gift, thus committing tax fraud. According to Byrd, Karfunkel emailed him on August 3, 2020, saying "I wanted to let you know that *I am transferring shares* to my charitable foundation. The transfer *is being made* for no consideration and is not a sale. Because *it is not a sale*, I have been advised that *the transfer is not subject to the blackout*."[220]   The emphasized language makes clear that, as of August 3, 2020, Karfunkel had not yet transferred the shares. Yet in his August 4, 2020 Schedule 13D SEC filing, he purported to have donated 3 million shares on July 29, 2020.

174.   The Special Committee dodged this obvious point by concluding that the "potential tax implications of Karfunkel's gift are outside of the scope of [its] investigation."[221]   There

---

[219] *Id.* at 57.

[220] *Id.* at 58 (emphasis added).

[221] *Id.* at 3, n.2.

is no legitimate reason for the Special Committee to arbitrarily limit its investigation when it was tasked with investigating Karfunkel's donation.  The Special Committee should have sought to recoup Karfunkel's ill-gotten tax gains back to Kodak.

175.    Finally, notwithstanding the highly questionable findings in the SC Report, the Special Committee should have re-opened its investigation in January 2021, following the revelation that Karfunkel somehow reduced the amount of shares that he had purportedly already donated months earlier.

176.    Accordingly, there is substantial doubt as to the reliability of the Special Committee's investigation regarding Karfunkel's purported charitable donation.

### E.    The Special Committee's Decision to Omit Material Facts from Its Report is Evidence of Its Bad Faith

177.    The Special Committee purportedly reviewed over 60,000 documents from fourteen Kodak employees, and conducted 44 witness interviews, as part of its investigation.[222] The Report, however, cherry picks facts that fit the Special Committee's conclusion, while ignoring and omitting contrary evidence, specifically evidence made public by the NYAG investigation.  This is evidence of the Special Committee's bad faith.

178.    First, the Report falsely states that before trading, "Continenza received preclearance from Byrd in accordance with Company policy."[223]  Only because of the NYAG's efforts do we know that Continenza neither requested pre-clearance of his June Trades, nor received written permission to trade.  Given the centrality of this "fact" to the Special Committee's conclusion regarding the propriety of the June Trades, the Special Committee's decision to obscure the truth is not only evidence of its bad faith, but casts doubt on the veracity of its entire Report.

---

[222] Report at 6.

[223] *Id.* at 40.

179.     Second, the Special Committee Report fails to disclose a slew of positive signs indicating that the outcome of the loan application process was likely to be positive.  Indeed, the allegations herein at paragraphs 114(a), (c)-(f) and (h)-(k) are based on facts that were not disclosed in the SC Report.  Rather, the NYAG uncovered and disclosed them as part of the NYAG Action.  Considering that a primary basis of the Special Committee's conclusion that Continenza did not trade in MNPI is his purported belief that the loan application process "had a low probability of success," which the omitted facts undermine, the Special Committee's decision to omit these facts from its Report is evidence of its bad faith.

180.     Third, the SC Report omits the fact that Byrd refused to preclear Continenza's trades just three months prior "in light of the 'materiality to the company' of a deal of significantly smaller magnitude and of less salience than the DFC loan."[224]  This is a material omission, because it casts doubt on Byrd's uncorroborated claim that he precleared the June Trades.

## THE SPECIAL COMMITTEE LACKED INDEPENDENCE

181.     The Special Committee was formed on August 6, 2020, and is composed of New and Kodak director William Parrett ("Parrett").  Neither New nor Parrett were capable of making a disinterested, independent determination with respect to potential claims concerning the June Trades, springloaded options or Karfunkel's tax fraud.

### A.     Jason New

182.     New is a CNG Committee member who approved the July 27, 2020 option grants.  New was incapable of considering the springloaded option grants disinterestedly or independently, considering that he was judging the propriety of his own conduct.

---

[224] Novack Aff. ¶ 36.

183.    New's longstanding relationships with Defendants also made him incapable of making a disinterested, independent decision about the potential claims against them.  New has been a Kodak director since 2013, working side by side with Defendants for many years. In addition, New worked as a Senior Managing Director at Blackstone, a New York City investment company and former institutional Kodak stockholder, from 2009 to 2019.  As part of Blackstone's investment in Kodak, it designated New, alongside Karfunkel, as its representatives on Kodak's Board.  The Board thus knew, or should have known, that New could not consider Karfunkel's alleged tax fraud in good faith.  Karfunkel is a 72-year old finance giant on the Forbes list, who, among other things, founded the American Stock Transfer & Trust Company, LLC and AmTrust Financial Services.  New knew that finding against Karfunkel could impact his career, given Karfunkel's influence in the industry.[225]

### B.    William Parrett

184.    Parrett served as a director of Kodak from November 2007 until Kodak's annual meeting on May 19, 2021, when he did not stand for re-election.  Parrett joined Kodak upon his retirement as the CEO of Deloitte Touche Tohmatsu Limited ("Deloitte") during a period in which Kodak paid Deloitte millions of dollars in consulting fees, and Parrett personally derived material financial benefits from the relationship.  According to the Form 8-K filed by the Company, when Parrett joined the board in November 2007, "the Company ha[d] paid Deloitte [] approximately $7.1 million year to date for tax, actuarial, consulting and other non-audit advisory service."  Parrett has thus worked with most of the Individual Defendants for many years, and has derived material financial benefits from those relationships.

---

[225] New left Blackstone in December 2019, and joined a credit investing company in April 2020, just a few months before the misconduct alleged herein occurred.

185.     Parrett also served on the board of Blackstone while New worked at Blackstone as a Managing Director, and during a period in which Blackstone was investing heavily in Kodak.

186.     In light of Parrett's numerous entanglements with various other Kodak officers and directors, as well as the significant compensation he received from Kodak during his time at Deloitte, Parrett was incapable of independently considering the merits of the potential claims against Continenza, the other Option Recipients or Karfunkel.

## DEFENDANTS CANNOT USE THE SECOND COMMITTEE TO CURE THE SPECIAL COMMITTEE'S DEFICIENCIES

187.     On September 17, 2021, Kodak's counsel informed Plaintiff that the Board formed the Second Committee to investigate what Kodak described as "new facts," including the facts disclosed by the NYAG in its *Ex Parte* Application and to be testified to by Byrd and Continenza. In a September 24, 2021 letter filing in the State Action, Kodak also explained that the Second Committee was authorized:

> to evaluate the [State] Complaint, conduct whatever further inquiry they believe to be necessary or prudent, and decide whether there are any facts or allegations that would cause the Company to change its view as to whether to seek dismissal of the Action.[226]

188.     The Second Committee comprises three members, including Defendant New, Darren Richman ("Richman") and Michael E. Sileck, Jr. ("Sileck").

189.     The Board's decision to form the Second Committee is a tacit concession that the Special Committee was deficient.  Indeed, as alleged herein, the Special Committee was conflicted, and did not make a good faith conclusion based upon a reasonable inquiry.

---

[226] *See* Exhibit D at 2.

190. The Second Committee does not satisfy the requirements of N.J.S.A. 14A:3-6.5 anyway, because numerous facts point to the likelihood that the Second Committee was formed to rubber-stamp the conclusions of the First Committee.

191. In particular, the Board's decision to include New—who was conflicted before he was even appointed to the Special Committee—as a Second Committee member makes it overwhelmingly likely that he will steer the Second Committee to the same result the Special Committee reached.

## THE INDIVIDUAL DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES AND INTERNAL COMPANY POLICIES

### A.    Defendants Breached Their Fiduciary Duties

192. By reason of their positions as Company officers and/or directors, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe the Company and its stockholders the fiduciary duties of good faith, loyalty and due care.  The Individual Defendants were and are required to act in accordance with those duties, and to act in furtherance of the best interests of the Company.

193. To discharge their duties, the Individual Defendants were and are required to put the interests of the Company ahead of their own, and to not use the Company to further their own interests.  The Individual Defendants did not do that here.

194. Continenza breached his fiduciary duties by using MNPI to benefit himself.  When he made the June Trades, Continenza knew that Kodak (1) was in deep negotiations about the DFC Loan, with good reason to be optimistic about their outcome; (2) had signed an LOI with Phlow; and (3) was committed to entering the pharmaceutical manufacturing space.

195. The CNG Committee's members (Defendants New, Katz, and Bradley) breached their fiduciary duties by authorizing and awarding springloaded options in violation of Kodak's

Executive Compensation Plan.  The CNG Committee authorized the options knowing the exercise prices were below Fair Market Value, because Kodak's stock price did not reflect MNPI about Kodak's receipt of the DFC LOI.

196.    The Option Recipients breached their fiduciary duties by receiving the springloaded options.  Each Option Recipient knew about the DFC Loan, given their direct involvement in its negotiation or their role at the Company, and thus knew they received springloaded options with exercise prices far below Fair Market Value.

### B.    Defendants Violated Company Policies

197.    Kodak's insider trading policies include a prohibition on trading in Kodak stock with MNPI, which the Company defines as, *inter alia*, "[s]ignificant new product developments," "[n]ew major contracts, orders, supplies, customers, or finance sources,"[227] "business strategies, pending contracts . . . and significant projects . . . ."[228]  Kodak's policies also require Company insiders to (1) request pre-clearance from Byrd via email at least one day before the transaction, and (2) not trade in Kodak stock until they receive a response as to whether the trade is permissible.

198.    Continenza violated Kodak's insider trading policies.  First, he did not request pre-clearance from Byrd one day before the trades by email.  Nor did he receive a response from Byrd that the trades were permissible.  Second, he made the June Trades knowing Kodak was pursuing the DFC Loan, had an LOI with Phlow, and was committed to entering the pharmaceutical manufacturing space (i.e., a "significant project" and "business strategy"), which was MNPI.

199.    Karfunkel also violated Kodak's insider trading policies.  He gifted 3 million Kodak shares outside of a permissible trading window.

---

[227] Report at 36.

[228] *Id.* at 37.

200.    With respect to granting equity awards, Kodak's Executive Compensation Plan prohibits granting stock options with exercise prices below Fair Market Value.   Kodak's Compensation Committee Policy on Equity Awards prohibits "manipulating the timing of . . . any Equity Award with the intent of benefiting a grantee under an Equity Award."   The CNG Committee violated both by authorizing and awarding the springloaded options with MNPI before the DFC Loan was announced, and thus at exercise prices far below Fair Market Value, which was intended to benefit the Option Recipients.  The Option Recipients likewise violated these policies by receiving the awards, knowing they were granted with exercise prices below Fair Market Value.

### C.    Defendants Violated Section 10(b) of the Exchange Act

201.    Defendants misled Kodak into granting options at less than fair market value, and then continued their scheme by making materially misleading representations in Kodak's SEC filings concerning the CNG Committee's practice of awarding options, and value of the July 27, 2020 options.

202.    The CNG Committee violated Section 10(b) by misleading Kodak into authorizing and awarding options for less than their fair value.  The Option Recipients violated Section 10(b) by knowingly accepting springloaded options and thus furthering the CNG Committee's scheme, The CNG Committee and Options Recipients all participated in the subsequent materially misleading misrepresentations made in Kodak's SEC filings concerning the Company's practice of granting options, and value of the July 27, 2020 option awards.

### **DAMAGES TO KODAK**

203.    Kodak has suffered significant harm as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment therefrom.

204.    Kodak's reputation, goodwill and productivity have suffered.  As a result of the conduct alleged herein, numerous lawsuits have been filed and multiple investigations have been

launched that Kodak has to defend.  The $765 million DFC Loan was put on hold, perhaps forever, along with the long-term value the DFC Loan was predicted to create for Kodak and its stockholders.  Kodak lost hundreds of millions of dollars in market capitalization.  Continenza misappropriated MNPI to benefit himself through the June Trades.  The Option Recipients continue to hold over-valued springloaded options, which will cost the Company millions of dollars upon their exercise.  Karfunkel made millions of dollars through his tax fraud.

205.    As a direct and proximate cause of Defendants' breaches of fiduciary duties, Kodak has expended, and will continue to expend, significant sums of money and value, including, *inter alia*, the continued costs incurred complying with governmental investigations and defending against lawsuits; losing the DFC Loan; authorizing and awarding springloaded options that did not give the Option Recipients "incentive" to perform; decreased productivity as a result of the unjust enrichment to Company insiders; and reputational harm.

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

206.    Plaintiff brings this action derivatively and in the right and for the benefit of Kodak to redress the Individual Defendants' breaches of fiduciary duties, unjust enrichment and other violations of the law.

207.    Plaintiff is a stockholder of Kodak, was a stockholder of Kodak at the time of the wrongdoing alleged herein, and has been a stockholder of Kodak continuously since that time.

208.    Plaintiff and his counsel will adequately and fairly represent the interests of Kodak in enforcing and prosecuting its rights.

209.    On August 13, 2020, Plaintiff made his pre-suit Litigation Demand on the Board to commence this action.

210.    On November 6, 2020, the Special Committee, through counsel, responded to and denied Plaintiff's Litigation Demand.

211.    The Board's wrongful refusal was not made in good faith, following a reasonable inquiry.  Rather, Plaintiff's Demand was refused on the basis of the conflicted Special Committee and its Report.  The Report whitewashed serious allegations without fairly investigating them, ignored key facts, and drew unreasonable, bad faith inferences from available facts.

212.    Plaintiff has standing to prosecute this action derivatively on Kodak's behalf.

## CLAIMS FOR RELIEF

## COUNT I

### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AGAINST THE CNG COMMITTEE AND OPTION RECIPIENTS

213.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

214.    This Count is brought on behalf of Kodak pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c) promulgated thereunder against the CNG Committee and Option Recipients.

215.    The CNG Committee and Option Recipients, individually and in concert, directly and indirectly knowingly or recklessly:

a)    Employed devices, schemes and/or artifices to defraud Kodak in connection with grants to, and exercise by, the Option Recipients of fraudulently-priced Kodak stock options;

b)    Made untrue statements of material fact to Kodak, the SEC and Kodak's stockholders and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, in order to defraud Kodak in connection with grants to, and exercises by, the Option Recipients of fraudulently-priced Kodak stock options; and/or

c)    Engaged in acts, practices, and a course of conduct that operated as a fraud or deceit upon Kodak causing Kodak to issue fraudulently-priced stock options and permitting the exercise of such options, at Kodak's expense.

216.    Kodak's SEC filings—and, specifically, the July 29 Form 4/A, 3Q20 10-Q, 2020 10-K and 2020 Proxy—included disclosures concerning the Company's practice of awarding

options and value of the July 27, 2020 option grants.  The CNG Committee and Option Recipients, who certified these filings, therefore knowingly and/or recklessly made material misrepresentations and omissions concerning the July 27, 2020 option grants.

217.   Each of the CNG Committee members and Option Recipients was a direct and necessary participant in the fraudulent options scheme, and acted with knowledge, or reckless disregard, of the wrongdoing alleged herein.  Each defendant implemented, perpetuated and/or furthered the scheme by, among other things, knowingly or recklessly:

a)   Approving and/or awarding the springloaded option grants to the Option Recipients;

b)   Causing Kodak to issue materially false and misleading statements in its July 29 Form 4/A, 3Q20 10-Q, 2020 10-K and 2020 Proxy  concerning the nature and validity of the springloaded stock option grants at issue in this Action; and/or

c)   Accepting springloading options, knowing Kodak was induced by fraudulent misrepresentations into giving discounted options.

218.   Defendants' deceptive conduct had the direct purpose and effect of misleading and defrauding Kodak, because it induced Kodak to issue option grants at prices below fair market value on the date of the grants, and thereby deprived Kodak of adequate compensation for the shares issued in connection with the grants.  Had Kodak not been defrauded by defendants' false and misleading statements and omissions, Kodak would not have issued the options at fraudulently manipulated prices and the springloading scheme could have been stopped in its tracks.

219.    As a direct and proximate cause of the CNG Committee and Option Recipients' misconduct, Kodak has sustained significant damages, as alleged herein.

220.   Plaintiff, on behalf of Kodak, has no adequate remedy at law.

## COUNT II

## FOR BREACHES OF FIDUCIARY DUTY AGAINST CONTINENZA
### (FOR INSIDER TRADING)

221.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

222.     By virtue of Continenza's position as Kodak's CEO and Executive Chairman, Continenza owed and owes Kodak the fiduciary duties of good faith, loyalty and due care in administering Kodak's affairs.  This includes the duty not to use Kodak's MNPI to benefit himself.

223.     Also by virtue of his position as Kodak's CEO and Executive Chairman, on June 23, 2020, Continenza knew that Kodak (1) was in deep negotiations with the DFC about the DFC Loan; (2) had an LOI with Phlow; and (3) was committed to entering the pharmaceutical manufacturing space.  Continenza was therefore in possession of MNPI when he made the June Trades—for which he did not request or receive pre-clearance in compliance with Company policy—which violated Kodak's policies against insider trading and breached his fiduciary duties. Kodak is entitled to recover from Continenza the benefits he received as a result of the June Trades.

224.     As a direct and proximate cause of Continenza's breaches of fiduciary duties, Kodak has sustained significant damages, as alleged herein.

225.     Plaintiff, on behalf of Kodak, has no adequate remedy at law.

## COUNT III

### FOR BREACHES OF FIDUCIARY DUTIES AGAINST KATZ, BRADLEY AND NEW (FOR GRANTING SPRINGLOADED OPTIONS)

226.      Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

227.     By virtue of their positions as Kodak directors and members of the CNG Committee, Katz, Bradley and New owed and owe Kodak the fiduciary duties of good faith, loyalty and due care.  In furtherance of these duties, they were required to act in the best interests of the Company and its stockholders.

228.     Katz, Bradley and New, as CNG Committee members, breached their fiduciary duties by granting springloaded options to the Option Recipients.  Katz, Bradley and New authorized and granted springloaded options to award their fellow directors and Kodak's officers, as described herein.  These springloaded grants were made in violation of Kodak's Executive Compensation Plan, which requires all stock options to be granted at an exercise price not less than the closing price of Kodak stock on the date of the grant.  These Individual Defendants intentionally authorized and approved the springloaded options at a time when they possessed MNPI soon to be released about the DFC Loan that would favorably affect Kodak's stock price. Defendants' actions were not a good faith exercise of prudent business judgment to promote Kodak's best interests, but rather to line the pockets of the Option Recipients at the expense of Kodak and its stockholders.

229.     As a direct and proximate cause of Katz, Bradley and New's breaches of fiduciary duties, Kodak has sustained and will continue to sustain damages, as alleged herein.

230.     Plaintiff, on behalf of Kodak, has no adequate remedy at law.

## COUNT IV

### FOR BREACHES OF FIDUCIARY DUTY AGAINST THE OPTION RECIPIENTS (FOR ACCEPTING THE SPRINGLOADED OPTIONS)

231.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

232.     As directors and/or officers of the Company, the Option Recipients owe Kodak the fiduciary duty of loyalty and are required to act in the best interests of Kodak and its stockholders.

233.     All of the Option Recipients breached their fiduciary duties by accepting the springloaded options and entering into option agreements knowing the options were springloaded at the time of the grant.  Continenza, Byrd and Bullwinkle knew about the DFC Loan.  Continenza

and Bullwinkle participated in the negotiations; Continenza, Byrd and Bullwinkle all attended the July 27, 2020 CNG Committee meeting at which the DFC Loan was discussed; and Continenza and Byrd convened the Board and CNG Committee for the July 27, 2020 meetings.  Vandagriff, as a senior member of Kodak management who reports directly to Continenza, would have also known about the DFC Loan.  Each of the Option Recipients knew the DFC Loan was material and would result in an increase in Kodak's stock price.

234.    As a direct and proximate cause of the Option Recipients' breaches of fiduciary duty, Kodak has sustained and will continue to sustain damages, as alleged herein.

235.    Plaintiff, on behalf of Kodak, has no adequate remedy at law.

## COUNT V

### FOR UNJUST ENRICHMENT AGAINST THE OPTION RECIPIENTS
### (FOR RECEIVING SPRINGLOADED OPTIONS)

236.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

237.    As a result of Bradley, New and Katz's decision to award springloaded options in breach of their fiduciary duties, the Option Recipients collectively received tens of millions of dollars of improper springloaded options.  They were unjustly enriched at the expense of, and to the detriment of, Kodak as a result of these breaches of fiduciary duty.

238.    It would be unconscionable and against the fundamental principles of justice, equity and good conscience for the Option Recipients to retain the springloaded options.

239.    To remedy the Option Recipients' unjust enrichment, the Court should enter an order rescinding the springloaded options or, alternatively, compelling the Option Recipients to disgorge to the Company the springloaded option awards they received, as well as any proceeds they derived therefrom.

## COUNT VI

### FOR UNJUST ENRICHMENT AGAINST KARFUNKEL
### (FOR UNJUST ENRICHMENT)

240.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

241.    Karfunkel violated Kodak's internal policies by donating 3 million shares to a sham charity after Kodak announced the DFC Loan, and outside of a permissible trading window. Karfunkel backdated the gift to benefit from the rise in Kodak's stock price, which provided him with tax benefits.  Karfunkel failed to comply with the Special Committee's internal investigation by refusing to provide the Special Committee with documents or witnesses to test the credibility of his story about his tax fraud.  Then, six months after purportedly making the gift, he changed the amount of shares that he gifted.

242.    Karfunkel was unjustly enriched at the expense and to the detriment of Kodak as a result of his actions.  It would be unconscionable and against the fundamental principles of justice, equity and good conscience for Karfunkel to retain the tens of millions of dollars of tax benefits he received.

243.    To remedy Karfunkel's unjust enrichment, the Court should enter an order compelling Karfunkel to disgorge to Kodak the benefits and proceeds he derived from his tax fraud.

244.    Plaintiff, on behalf of Kodak, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding the Company damages it sustained as a result of the Individual Defendants' breaches of fiduciary duty, unjust enrichment, violations of Section

10(b) and any other damages the Company may sustain in connection with the facts

alleged herein;

B.      Ordering Continenza to disgorge the profits he received as a result of the June

Trades;

C.      Ordering rescission of the springloaded options;

D.      Ordering the Options Recipients to disgorge to the Company the springloaded

option awards, as well as any proceeds that they derived therefrom;

E.      Ordering Karfunkel to disgorge to the Company all tax benefits and other profits

he received in connection with his tax fraud;

F.      Granting appropriate equitable relief to remedy the misconduct alleged herein;

G.      Awarding to Plaintiff the costs and disbursements of this action, including

reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any

and all issues in this action so triable of right.

Dated:  October 4, 2021
        Rochester, New York

**FARACI LANGE**

By: */s/ Hadley Lundback Matarazzo*
Hadley Lundback Matarazzo
28 East Main Street, Suite 1100
Rochester, NY  14614
hmatarazzo@faraci.com
Tel: (585) 325-5150
Fax: (585) 325-3285

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Lee D. Rudy
Eric L. Zagar
Stacey A. Greenspan
Henry W. Longley
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

*Attorneys for Plaintiff*

## **<u>VERIFICATION</u>**

I, LOUIS PETERS, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint (the "Complaint"). I have reviewed the allegations in the Complaint. The facts therein are true and correct to the best of my knowledge, information and belief, except for those matters stated on information and belief, and as to those matters, I believe them to be true based upon my counsel and counsel's investigation. I am a current holder, and have been a holder, of Eastman Kodak Company common stock at all relevant times.

I declare under penalty of perjury that the foregoing is true and correct.


DATE: <u>10/1/2021</u>                    */s/ Louis Peters*
                                       LOUIS PETERS