UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

In re EASTMAN KODAK COMPANY
DERIVATIVE LITIGATION

**DECISION AND ORDER**

6:21-CV-6621 EAW

_____

## INTRODUCTION

This shareholder derivative action arises out of the events surrounding a Letter of Interest ("LOI") entered into between nominal defendant Eastman Kodak Company ("Kodak") and the United States International Development Finance Corporation ("DFC") in July of 2020, discussing a contemplated loan of $765 million from DFC to Kodak to support the conversion of Kodak's manufacturing facilities to produce pharmaceutical products.[1]  It consists of two matters commenced by Kodak shareholders and consolidated for all purposes into a single action denominated "In re Eastman Kodak Company Derivative Litigation."  (Dkt. 71).

The operative pleading is the corrected verified consolidated stockholder derivative complaint.  (Dkt. 129) (the "consolidated complaint").  In the consolidated complaint, plaintiffs Louis Peters ("Peters") and Herbert Silverberg ("Silverberg") (collectively "Plaintiffs") allege violations of the Securities Exchange Act of 1934 (the "Exchange

---

[1]     On September 27, 2022, this Court dismissed an action arising out of the same factual background and alleging violations of federal securities laws.  *In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d 169, 175 (W.D.N.Y. 2022), *appeal withdrawn sub nom.*, *Les Investissements Kiz Inc. v. Eastman Kodak Co.*, No. 22-2788, 2023 WL 3149527 (2d Cir. Jan. 26, 2023).

Act"), breaches of fiduciary duties, and unjust enrichment by Kodak's Executive Chairman and CEO James V. Continenza ("Continenza"), CFO David Bullwinkle ("Bullwinkle"), General Counsel Roger W. Byrd ("Byrd"), Senior Vice President Randy D. Vandagriff ("Vandagriff"), director Philippe D. Katz ("Katz"), director Richard Todd Bradley ("Bradley"), director Jason New ("New"), and director George Karfunkel ("Karfunkel") (collectively "Defendants").  (*Id*).  Continenza, Bullwinkle, Byrd, and Vandagriff are sometimes collectively referred to as "Option Recipients," while Katz, Bradley, and New are sometimes collectively referred to as the "CNG Committee."  Kodak is named as a nominal defendant.  (*Id*.).

Presently before the Court are: (1) a motion to dismiss for failure to state a claim, or in the alternative, for summary judgment filed by Kodak (Dkt. 100); (2) a motion to dismiss for failure to state a claim filed by Continenza, Bullwinkle, Byrd, Bradley, Katz, New, and Vandagriff (Dkt. 101); (3) a motion to dismiss for failure to state a claim filed by Continenza (Dkt. 102); and (4) a motion to dismiss for failure to state a claim filed by Karfunkel (Dkt. 103).  For the reasons that follow, the Court grants Kodak's motion for summary judgment and denies the remaining motions as moot.

## **BACKGROUND**

### I.    **Factual Background**

Continenza became Kodak's Executive Chairman on or about February 20, 2019. (Dkt. 129 at ¶ 45).  Continenza and Kodak entered into an employment agreement and an "Award Agreement" pursuant to the Eastman Kodak Company 2013 Omnibus Incentive Plan (the "Incentive Plan").  (*Id*.).  These agreements provided Continenza with options to

purchase 1.75 million Kodak shares at various strike prices and were disclosed on April 1, 2019. (*Id*.).

At that time, Kodak's market capitalization was approximately $100 million. (*Id*. at ¶ 46). Kodak's April 1, 2019 Form 10-K disclosed that its auditors had issued a going concern qualification based on its liquidity, capital resources, and negative cash flow. (*Id*.). Each of Kodak's subsequent annual reports has included a similar going concern qualification. (*Id*.).

On May 21, 2019, Kodak and Southeastern Asset Management ("Southeastern") entered into a Notes Purchase Agreement (the "Purchase Agreement") for $100 million of Secured Convertible Notes (the "Notes") due in 2021. (*Id*.). The Notes were convertible into Kodak stock at a price of $3.17482 per share. (*Id*.). Upon conversion, they would represent 42.8% of Kodak's outstanding shares. (*Id*.). At a February 2020 meeting of Kodak's board of directors (the "Board"), Karfunkel proposed that Continenza be given an additional two million options to offset the potential devaluing of his options associated with the Purchase Agreement between Kodak and Southeastern. (*Id*. at ¶ 47).

Following the onset of the COVID-19 pandemic in 2020 and its associated drug shortages, Kodak recognized an opportunity to expand its pharmaceutical business, including the manufacture of key starting materials ("KSMs") that pharmaceutical companies use to make Active Pharmaceutical Ingredients ("APIs"), which are in turn used to make final drug products. (*Id*. at ¶¶ 48-49). Kodak began reaching out to governmental officials and agencies, looking for an opportunity to partner with the government to

leverage its chemical manufacturing capacity and expertise.  (*Id*. at ¶ 49).  Kodak gave this initiative the code name "Project Tiger."  (*Id*.).

As part of Project Tiger, Kodak's Vice President of Public Affairs contacted the Biomedical Advanced Research and Development Authority ("BARDA").  (*Id*. at ¶ 50). BARDA was the federal agency responsible for investing in countermeasures to diagnose, treat, and protect against COVID-19.  (*Id*.).  BARDA suggested that Kodak reach out to Phlow Corporation ("Phlow"), a "pharmaceutical management company focused on securing domestic drug reserves."  (*Id*.).  Phlow was in the process of negotiating a contract with BARDA to manufacture medications to treat COVID-19.  (*Id*.).

In March of 2020, Phlow's CEO Eric Edwards ("Edwards") told Kodak that he had been working with Congress, the White House, and other government agencies on increasing domestic pharmaceutical manufacturing.  (*Id*. at ¶ 51).  In April of 2020, Phlow connected Kodak with Peter Navarro ("Navarro"), the Director of the White House Office of Trade and Manufacturing Policy, and Chris Abbott ("Abbott"), a White House senior policy analyst.  (*Id*. at ¶ 52).  Kodak had several conversations with Navarro and Abbott in April and May of 2020.  (*Id*.).  On May 14, 2020, then-President Trump issued an executive order pursuant to the Defense Production Act allow DFC to issue loans to support "domestic production of strategic resources needed to respond to the COVID-19 outbreak." (*Id*. at ¶ 53).

On April 9, 2020, Kodak issued its annual proxy statement on Schedule 14A (the "2020 Proxy").  (*Id*. at ¶ 54).  The 2020 Proxy solicited stockholder approval with respect to a May 20, 2020 annual meeting of shareholders.  (*Id*.).  The fourth proposal in the 2020

Proxy ("Proposal 4") sought to add approximately 2.2 million shares to the Incentive Plan, and was necessary because there were not enough shares available in the Executive Compensation Plan to satisfy the Board's February 2020 agreement to award additional options to Continenza. (*Id*. at ¶¶ 55-56). Kodak's shareholders approved Proposal 4 on May 20, 2020. (*Id*. at ¶¶ 57-58).

On May 18, 2020, BARDA awarded Phlow an $812 million contract to domestically manufacture generic medicines and pharmaceutical ingredients to fight COVID-19. (Dkt. ¶ 59). On May 22 and 28, 2020, Kodak employees discussed Kodak's ability to manufacture APIs with Navarro and Abbott. (*Id*. at ¶ 60). During the May 22nd call, in which Continenza participated, Kodak requested $27 million to allow it to swiftly bring itself into regulatory compliance to manufacture APIs. (*Id*. at ¶ 61). Navarro told Continenza that Kodak should "think bigger" and more "long term," and requested a more comprehensive proposal by May 28, 2020. (*Id*.).

On May 28, 2020, Kodak presented to Navarro and Abbott a proposal for a grant of approximately $435-575 million, to establish a new "U.S. Advanced API Manufacturing Center." (*Id*. at ¶ 63). Navarro set a deadline of June 3, 2020, for a more detailed proposal. (*Id*.).

On May 31, 2020, Abbott set up a call between Kodak and DFC for June 1, 2020. (*Id*. at ¶ 64). Continenza, Bullwinkle, and Byrd, among others, participated in the June 1, 2020 call. (*Id*.). During the call, personnel from DFC walked Kodak through DFC's loan application process and explained how a non-recourse financing loan might work. (*Id*.). Kodak had follow-up discussions with Abbott and DFC personnel in the first week of June

of 2020. (*Id*. at ¶ 65). During those discussions, Abbott directed Kodak to submit its updated proposal to DFC, rather than to Navarro. (*Id*.). Kodak's primary point of contact at DFC was Alale Allal ("Allal"), with whom Continenza had frequent one-on-one calls to ask or answer questions. (*Id*.). On June 8, 2020, Kodak and Phlow entered into a letter of intent contemplating a long-term supply contract whereby Kodak would supply Phlow with certain APIs and KSMs. (*Id*. at ¶ 66).

On June 11, 2020, Kodak's Managing Director of Corporate Development Paula Gutkin directed that a new project clearance list be created for Project Tiger. (*Id*. at ¶ 68). Continenza and Byrd were both on the Project Tiger clearance list. (*Id*.). On June 12, 2020, Kodak's Chief Technical Officer ("CTO") Terry R. Taber ("Taber") sent Continenza and Bullwinkle a PowerPoint deck entitled "Project Tiger: Application for DFC-DPA Loan Program (DCF-014)" (the "Project Tiger Deck"). (*Id*. at ¶ 69). The Project Tiger Deck set the following timeline for the loan application process: (1) application to be submitted by June 26, 2020; (2) application to be finalized by the end of June of 2020; (3) letter of interest with the government to be signed in mid-July 2020; (4) loan to be awarded in mid-August 2020. (*Id*.).

On June 15, 2020, Kodak signed another letter of intent with Phlow. (*Id*. at ¶ 70). This letter of intent contemplated Phlow purchasing chemicals from Kodak and was entered into in furtherance of Kodak's application to DFC, to demonstrate that Kodak had a customer for future APIs. (*Id*.). On June 16, 2020, Kodak filed a preliminary loan application. (*Id*. at ¶ 76). Over the next few days, Kodak's management continued to supplement the DFC loan application with additional materials. (*Id*. at ¶ 79).

- 6 -

On June 18, 2020, all Project Tiger team members were advised that they had been added to the clearance list for a confidential project.  (*Id*. at ¶ 80).  The email conveying this information included a link to an internal Kodak memo (the "Project Tiger Memo") advising Project Tiger team members that information associated with Project Tiger could constitute material non-public information ("MNPI").  (*Id*.).  The Project Tiger Memo warned against trading in Kodak stock with MNPI and instructed that team members preclear transactions with Byrd before trading.  (*Id*.).

On June 23, 2020, Continenza purchased 46,737 shares of Kodak stock at an average price of $2.22 per share (the "June 2020 Trades").  (*Id*. at ¶ 82).  June 23, 2020, was the last day of a "Window Period" that had been open since May 15, 2020, during which Kodak insiders were allowed to transact in Kodak stock.  (*Id*.).  Plaintiffs contend that Continenza did not comply with Kodak's insider trading policy in connection with the June 2020 Trades.  (*Id*. at ¶ 83).  In particular, Plaintiffs allege that Continenza did not comply with the requirement that he submit a request to Byrd via email at least one day in advance of the proposed transaction and wait to receive a response before transacting in Kodak stock.  (*Id*.).

Also on June 23, 2020, and at Continenza's direction, Kodak awarded Project Tiger team members $30,000 in bonuses.  (*Id*. at ¶ 84).  On June 26, 2020, Kodak submitted its final loan application to DFC.  (*Id*. at ¶ 85).  The final loan application contemplated a $765 million DFC loan and projected that Kodak's pharmaceuticals business would generate revenues of more than $200 million by 2024 and more than $300 million by 2025, with additional increases thereafter.  (*Id*. at ¶¶ 85-86).  Internally, Kodak projected that its

pharmaceuticals project would have positive cash flow and earnings before interest, taxes, depreciation and amortization ("EBITDA") of more than $150 million by 2025. (*Id*. at ¶ 86). In 2019, Kodak's entire net income was $116 million and its EBITDA was $95 million. (*Id*.).

DFC conducted due diligence on Kodak's final loan application through early and mid-July of 2020. (*Id*. at ¶ 88). On July 22, 2020, Continenza and Bullwinkle led Allal on a tour of Kodak's Rochester operations. (*Id*. at ¶ 89). Allal thereafter advised Continenza, Bullwinkle, and other members of Kodak's management that DFC wanted to enter into a letter of interest with Kodak regarding the requested loan. (*Id*.). DFC representatives further advised Kodak that DFC wanted to issue a press release announcing the letter of interest and hold a public signing ceremony on July 28, 2020. (*Id*.). On July 23, 2020, Kodak received the first draft of a term sheet setting forth the terms of the loan from DFC. (*Id*.).

On July 27, 2020, at 11:25 a.m., a Kodak employee erroneously sent press releases regarding the DFC LOI to several news outlets without including instructions that the release of the included information was embargoed until the next day. (*Id*. at ¶ 92). Prior to this error being corrected, the Twitter accounts for two Rochester-based news outlets tweeted that Kodak would be making a big announcement the following day. (*Id*. at ¶ 93). Kodak thereafter realized its mistake and contacted the parties to whom the press release had been sent, and the tweets were no longer available as of 12:56 p.m. (*Id*. at ¶ 94). On July 27, 2020, approximately 1.6 million shares of Kodak common stock traded, up from 74,983 shares traded during the previous trading session on July 24, 2020, and 80,840

shares traded on July 23, 2020. (*Id*. at ¶ 95). Kodak shares also increased in price by more than 23%. (*Id*.).

On July 27, 2020, Continenza and Byrd convened Kodak's Board and Compensation, Nominating and Governance ("CNG") Committee for a joint meeting. (*Id*. at ¶ 91). Katz, Bradley, and New were members of the CNG Committee. (*Id*. at ¶¶ 37-39). Byrd wanted the CNG Committee to grant options to members of Kodak's senior management, including himself, and had structured the option grants so that the lowest exercise price was $3.03 per share. (*Id*. at ¶ 91). The July 27, 2020 meeting was held telephonically, with Bullwinkle observing. (*Id*. at ¶ 97). The details of the DFC LOI and Kodak's business plan for pharmaceutical manufacturing were discussed. (*Id*.). Byrd then discussed the option grants with the CNG Committee members. (*Id*. at ¶ 98). Following Byrd's presentation, the CNG authorized the issuance of 1.75 million stock options to Continenza, with 28.75% of those options vesting immediately, and the remainder upon the conversion of the Southeastern Notes. (*Id*. at ¶ 99). The CNG Committee also awarded 45,000 stock option grants to each of Bullwinkle, Byrd, and Vandagriff. (*Id*. at ¶ 100).[2]

On July 28, 2020, Kodak and DFC announced the DFC LOI and held a public signing ceremony. (*Id*. at ¶ 101). That same day, *The Wall Street Journal* posted an article about the DFC LOI in which Continenza was quoted as saying that he expected the loan to

---

[2]     The parties vigorously contest whether these options were "springloaded." The consolidated complaint describes "springloading" as deliberately granting options in advance of publicly releasing positive news, and alleges that it is "both illegal as a matter of corporate law, and a violation of Kodak's compensation policies." (Dkt. 129 at ¶ 5).

create around 300 jobs in Rochester and 30 to 50 jobs in Minnesota.  (*Id*.).  Kodak's stock price closed on July 28, 2020, at $7.94 per share.  (*Id*.).

On July 29, 2020, before the market opened, Continenza appeared on CNBC's *Squawk Box* to discuss the DFC LOI.  (*Id*. at ¶ 102).  Continenza stated while there was still "some work to do," he felt "very comfortable that we can bank on it" and "very comfortable we're gonna get to the end game."  (*Id*.).  Later that morning, Continenza appeared on *Fox Business News* and was interviewed by *Yahoo! News* regarding the DFC LOI.  (*Id*. at ¶¶ 105-06).  That same day, Kodak employees received an email from Continenza in which he announced the new strategic initiative and the creation of "Kodak Pharmaceuticals."  (*Id*. at ¶ 107).  "Kodak's stock price closed at $33.20 per share on July 29, 2020, after reaching a high of $60 per share and trading at an average price of $38.75." (*Id*. at ¶ 108).

Also on July 29, 2020, Continenza, Bullwinkle, Byrd, and Vandagriff each filed a Form 4 disclosing the option awards they had been granted on July 27, 2020.  (*Id*. at ¶ 118). A few media outlets reported on the option grants after the markets closed.  (*Id*. at ¶ 119). On July 30, 2020, Continenza filed a Form 4/A indicating that the options resulted from an earlier understanding with Kodak's Board.  (*Id*. at ¶ 120).

Additional media scrutiny regarding the option award to Continenza caused Kodak's share price to drop.  (*Id*. at ¶ 122).  On July 31, 2020, Kodak's stock price fell to $21.85 per share.  (*Id*. at ¶ 131).  News reporting regarding the option awards continued over the weekend, and on Monday, August 3, 2020, Kodak's stock price closed at $14.94. (*Id*. at ¶ 132).

On August 3, 2020, U.S. Senator Elizabeth Warren submitted a letter to the Securities and Exchange Commission ("SEC") requesting that Kodak be investigated. (*Id*. at ¶ 133). On August 4, 2020, *The Wall Street Journal* reported that the SEC was expected to examine the July 27, 2020 stock option grants. (*Id*. at ¶ 134).

Also on August 4, 2020, Karfunkel and his wife filed a Schedule 13D with the SEC indicating that on July 29, 2020, they had donated 3 million Kodak shares to Congregation Chemdas Yisroel Inc. ("Chemdas Yisroel"), a charitable foundation that Karfunkel founded and controls. (*Id*. at ¶ 123). Plaintiffs allege that Chemdas Yisroel "appears to be a sham." (*Id*. at ¶ 125). On January 14, 2021, Karfunkel filed with the SEC a Schedule 13D stating that it was 1,937,708 shares, and not the originally reported 3 million shares, that were donated to Chemdas Yisroel. (*Id*. at ¶ 127).

On August 5, 2020, "several House Congressional committees sent a joint letter to Continenza requesting documents regarding the DFC Loan, as well as trading activity by Company executives before the loan was announced." (*Id*. at ¶ 135). These committees also sent a letter to DFC's CEO seeking documents. (*Id*.). In addition, members of Congress sent the SEC a letter raising concerns about the July 27, 2020 stock option grants. (*Id*. at ¶ 136).

After the market closed on Friday, August 7, 2020, DFC announced: "On July 28, we signed a Letter of Interest with Eastman Kodak. Recent allegations of wrongdoing raise serious concerns. We will not proceed any further unless these allegations are cleared." (*Id*. at ¶ 137). The following Monday, Kodak's stock price opened at $8.90, after closing at $14.88 per share on August 7, 2020. (*Id*.).

On August 6, 2020, the Board formed a special committee (the "Special Committee") "to investigate Continenza's June Trades, the July 2020 option awards, and Karfunkel's 'charitable donation' of Kodak stock." (*Id*. at ¶ 142). The Special Committee was comprised of New and Kodak director William Parrett ("Parrett"). (*Id*.). The Special Committee retained the law firm of Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") to assist in the investigation. (*Id*. at ¶¶ 10, 142). Akin Gump drafted a report dated September 15, 2020 (the "Special Committee Report"), which the Special Committee adopted in total. (*Id*. at ¶ 143). Plaintiffs contend that the Special Committee Report failed to disclose that Akin Gump "had acted as counsel for Continenza since at least February 2017" and "also failed to disclose whether it ever informed the members of the Special Committee of its work for Continenza." (*Id*.). The Special Committee Report found that Continenza did not have MNPI when he bought Kodak stock on June 23, 2020, that the July 27, 2020 option grants were proper, and that the alleged tax fraud scheme by Karfunkel was not provable. (*Id*. at ¶ 144).

As part of an investigation into Continenza's June 2020 Trades, the New York State Attorney General ("NYAG") served Kodak with a subpoena on November 26, 2020. (*Id*. at ¶ 19). On June 1, 2021, the NYAG filed an ex parte application stating that it had determined to file a complaint against Continenza for trading in Kodak securities based on MNPI. (*Id*.); *see* Ex Parte Application, *Letitia James v. Eastman Kodak Co., et al*., Index No. 451652/2021 (N.Y. Sup. Ct. June 1, 2021).

On September 17, 2021, Kodak's Board appointed a second special committee (the "Second Committee") to perform an additional inquiry into the facts underlying this action.

(Dkt. 129 at ¶ 228).   The Second Committee had three members: New, Darren Richman, and Michael E. Sileck, Jr.   (*Id*. at ¶ 229).   The Second Committee retained the law firm Crowell & Moring ("Crowell"), which prepared a report (the "Second Committee Report"). (*Id*. at ¶ 236).   The Second Committee Report found that Akin Gump was not conflicted and otherwise reached the same conclusions as the Special Committee Report.   (*Id*. at ¶¶ 22, 25-27, 236).

II.   **Procedural Background**

On August 12, 2020, Peters sent Kodak a shareholder litigation demand.   (Dkt. 111 at 1).   Silverberg sent Kodak a shareholder litigation demand on August 24, 2020.   (*Id*. at 1-2).   On September 14, 2020, the Board unanimously voted to accept the Special Committee Report.   (*Id*. at 9).

On May 19, 2021, Peters filed a putative shareholder derivative complaint in New York State Supreme Court, Monroe County (the "State Court Action").   (*Id*. at 12).   The State Court Action has been stayed pending resolution of the instant action.   (*Id*. at 13).

On September 2, 2021, Silverberg filed a putative shareholder derivative action in this Court, *Silverberg v. Continenza*, No. 6:21-cv-06567 (the "Silverberg Action").   On October 4, 2021, Peters filed a putative shareholder derivative action in this Court, *Peters v. Continenza*, No. 6:21-cv-06621 (the "Peters Action").   By Order dated January 18, 2022, the Silverberg Action and the Peters Action were consolidated into the instant action.   (Dkt. 71).   On February 16, 2022, Plaintiffs filed a verified consolidated complaint.   (Dkt. 72).

On March 4, 2022, the Court entered a Case Management Order upon consent of the parties, whereby limited discovery was to be completed prior to the filing of certain

motions to dismiss.  (Dkt. 74).  The Court's Case Management Order further set forth a procedure whereby certain motions to dismiss would be served by April 15, 2022, but the moving party was to file on CM/ECF only a copy of the cover letter serving the motion, which was to be designated as a letter.  (*Id*.).  Only upon close of the limited, threshold discovery were the motions to dismiss to be filed on CM/ECF.  (*Id*.).

Consistent with the Court's Case Management Order, the pending motions to dismiss (and their supporting papers) were filed on CM/ECF on September 30, 2022.  (Dkt. 100; Dkt. 101; Dkt. 102; Dkt. 103; Dkt. 104; Dkt. 105).  Responding papers were filed on November 14, 2022.  (Dkt. 111; Dkt. 112; Dkt. 113).  Replies were filed on December 23 and 27, 2022.  (Dkt. 120; Dkt. 121; Dkt. 122; Dkt. 123).

On February 8, 2023, the Court received from Plaintiffs' counsel a letter seeking to "correct a mistake of fact made in their Verified Consolidated Stockholder Derivative Complaint (ECF No. 72) . . ., and repeated in Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss, or in the Alternative, For Summary Judgment (ECF No. 113) . . . and Plaintiffs' Local Rule 56(A)(2) Opposing Statement to Nominal Defendant Eastman Kodak Company's Statement of Undisputed Material Facts and Statement of Facts Believed to be in Dispute . . . (ECF No. 111)."  (Dkt. 126).  Plaintiffs' counsel explained that "Plaintiffs' Complaint ¶ 147 quotes 'Defendants' Answer, Affirmative Defenses and Verified Counterclaims and Third-Party Claims' in the *White Energy* matter [*Standard General Master Fund L.P., et al., v. White Energy Holdco, LLC, et al.,* No. 2017-0561-JRS (Del. Ch. 2017)], which states that in that matter, 'Akin Gump represented Mr. Continenza.'  The Complaint refers to this filing, which is attached as Exhibit 3 to my

Declaration (ECF No. 112), as 'verified.' Complaint ¶ 241. In fact, while the 'Counterclaims and Third-Party Claims' were verified, the 'Answer' was not. Therefore Plaintiffs' references to the answer as 'verified' and 'sworn' in the Opposition, at 21-22, 23, 44, and 64, were factually incorrect." (*Id*.).

Thereafter, the Court entered a Stipulation and Order allowing for the filing of a corrected complaint. (Dkt. 128). This Stipulation and Order provides that the filing of a corrected complaint will not impact the pending motions to dismiss. (*Id*. at ¶ 2). The operative consolidated complaint (that is, the corrected complaint) was filed on March 1, 2023. (Dkt. 129).

The consolidated complaint contains the following causes of action: (1) a claim for violation of § 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder against the CNG Committee and the Option Recipients; (2) a claim for violations of § 14 of the Exchange Act and Rule 14a-3(a)(1) promulgated thereunder against Continenza; (3) a claim for breach of fiduciary duty against Continenza; (4) a claim for breach of fiduciary duty against Katz, Bradley, and New; (5) a claim for breach of fiduciary duty against the Option Recipients; (6) a claim for unjust enrichment against the Option Recipients; and (7) a claim for unjust enrichment against Karfunkel. (*Id*. at ¶¶ 281-315).

The Court heard oral argument on the pending motions on August 9, 2023, and reserved decision. (Dkt. 134).

## DISCUSSION

### I.   Kodak's Motion to Dismiss or for Summary Judgment

#### A.   Legal Standard

Kodak has moved for dismissal or, in the alternative, for summary judgment, in reliance on the New Jersey Business Corporation Act ("NJBCA"), N.J.S.A. 14A:3-6.3, 14A:3-6.5.   A discussion of the applicability and procedural requirements of this state statute is necessary before the Court turns to the merits of Kodak's motion.

A shareholder derivative action, such as this one, "permits an individual shareholder to bring suit to enforce a corporate cause of action against officers, directors, and third parties." *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004) (quotation omitted).   "Since claims asserted in a shareholder derivative suit belong to the corporation, it is incumbent upon shareholder plaintiffs to make a demand upon the corporation's board of directors prior to commencing an action." *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 273 (S.D.N.Y. 2006).   "Pre-suit demand requirements . . . are governed by the law of the state of incorporation[.]" *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. V. Lundgren*, 579 F. Supp. 2d 520, 528 (S.D.N.Y. 2008) (citation omitted); *see also Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 101 (1991) (explaining that state substantive law applies "[b]ecause the contours of the demand requirement—when it is required, and when excused—determine who has the power to control corporate litigation").

Kodak is a New Jersey corporation with its principal place of business in Rochester, New York.   (Dkt. 129 at ¶ 30).   Accordingly, and as the parties agree, New Jersey law

governs the pre-suit demand requirements in this action. The NJBCA "categorically require[es] shareholders to make a pre-suit demand on a corporation prior to filing a derivative suit," *Hirschfeld v. Beckerle*, 405 F. Supp. 3d 601, 606 (D.N.J. 2019), unless the corporation opts out of the requirement in its certificate of incorporation, which Kodak has not. *See* N.J.S.A. 14A:3-6.3. Further, the NJBCA provides that a corporation's board of directors may determine whether maintenance of a derivative proceeding would be in the corporation's best interest, or may delegate that authority to a "committee consisting of one or more independent directors appointed by majority vote of independent directors." N.J.S.A. 14A:3-6.5(2)(b). Where such a committee rejects a shareholder litigation demand, a shareholder may maintain a derivative action only if his or her complaint "allege[s] with particularity facts establishing that a majority of the board of directors, or all members of a committee, which in either case determined the matter, did not consist of independent directors at the time the determination was made." *Id*. 14A:3-6.5(3).

If the shareholder satisfies this standard, the corporation may nevertheless seek dismissal by making a "written filing with the court setting forth . . . facts to show: (i) whether or not a majority of the board of directors was independent at the time of the determination . . . ; and (ii) that the independent director or directors made the determination [*i.e.*, to reject the shareholder's demand to commence litigation] in good faith after conducting a reasonable inquiry upon which the conclusions are based." *Id.* 14A:3-6.5(5)(a)(i)-(ii). The NJBCA sets forth different burdens of proof on such a motion to dismiss, depending on whether the majority of the board of directors was independent at the time of the challenged determination. *Id*. 14A:3-6.5(4). If the majority of the board

was independent (as defined by New Jersey law), then the shareholder plaintiff bears the burden of proving that the determination to reject his or her demand was not made "in good faith, after conducting a reasonable inquiry." *Id*. 14A:3-6.5(1)(a).  If the majority of the board was not independent, the corporation bears the same burden. *Id*. 14A:3-6.5(4).

In *Halebian v. Berv*, 644 F.3d 122 (2d Cir. 2011), the Court of Appeals for the Second Circuit had occasion to consider the interplay between the Federal Rules of Civil Procedure and a provision of Massachusetts law, Mass. Gen. Laws ch. 156D, § 7.44, that is largely identical to the relevant provisions of the NJBCA.  The *Halebian* court explained that the relevant Massachusetts statute (§ 7.44) "sets forth both substantive standards for adjudicating the effectiveness of a board's rejection of a demand and instructions regarding the procedure by which that rejection must be communicated to—and its validity established before—a court," and  "does not easily fit within the constraints of [Federal] Rule [of Civil Procedure] 12(b)(6), even as it has been broadened by occasional judicial glosses on its terms."  644 F.3d at 130.  "Insofar as the section 7.44 procedure encourages or requires the parties to submit, and under which it is expected that the court will review, evidentiary materials outside the scope of what the plaintiff has already included or incorporated into his or her complaint, the section 7.44 procedure appears to be incompatible with a federal court's limited powers to grant a Rule 12(b)(6) motion to dismiss." *Id*. at 132.  As such, the Second Circuit instructed the district court on remand "to adjudicate the claim within the framework of summary judgment[.]" *Id*.

In its motion, Kodak—relying on an unpublished New York trial court case—suggests that the Court could properly consider outside material on a motion to dismiss

made pursuant to the NJBCA, because its provisions are substantive. (*See* Dkt. 100-33 at 24-25 n.10 (citing *Rotz v. Van Kampen Asset Mgmt.*, Index No. 651060/2010, 2014 WL 5431156, at \*6 (Sup. Ct., N.Y. Cnty. Oct. 22, 2014))); *see also* Dkt. 123 at 6 (arguing in reply that "Courts evaluate N.J.S.A. 14A:3-6.5(5) motions under both Rule 12(b)(6) and Rule 56, as such motions are 'unique,' and it is within the court's discretion to determine which Rule applies."). Plaintiffs, on the other hand, argue that "as in *Halebian*, this Court should apply the requirements of Fed. R. Civ. P. 56 in assessing whether the requirements of the [NJBCA] have, or have not, been satisfied so as to require dismissal of this case." (Dkt. 113 at 50).

The Court is unpersuaded by Kodak's argument, which it views as foreclosed by the Second Circuit's decision in *Halebian*. Kodak's assertion in reply that "[c]ourts evaluate N.J.S.A. 14A:3-6.5(5) motions under both Rule 12(b)(6) and Rule 56" is not supported by the case law it cites. In particular, Kodak again cites the unpublished *Rotz* case, which it describes as "evaluating NJBCA motion under CPLR 3211(a)(7), equivalent to Rule 12(b)(6)." (Dkt. 123 at 6-7). In other words, Kodak has not actually cited any cases in which a court applied Rule 12(b)(6) to a motion under the NJBCA. Moreover, this Court is bound by the rulings of the Second Circuit with respect to the application of the Federal Rules of Civil Procedure. Accordingly, the Court will treat Kodak's motion as a motion for summary judgment under Federal Rule of Civil Procedure 56.

The parties also devote portions of their briefs to arguing over the relationship between the burden of proof specified by the NJBCA and Rule 56. Plaintiffs "acknowledge that they have the burden pursuant to § 14A:3-6.5(4) to refute Defendants' arguments

regarding the adequacy of both the Special Committee and the Second Committee investigations," but argue that the Rule 56 standard still places the burden on Kodak to show the absence of any genuine dispute as to a material fact. (Dkt. 113 at 50). In reply, Kodak argues that "Plaintiffs cannot evade or re-shift their burden back to Kodak simply because Rule 56 is involved," and that "[b]urden-shifting provisions similar to and including those in the NJBCA are substantive, not procedural, and thus apply whether a motion is considered under Rule 12(b)(6) or Rule 56." (Dkt. 123 at 7-8).

Kodak is correct that "[a] burden of proof . . . 'is a rule of substantive law.'" *Howard Univ. v. Borders*, 588 F. Supp. 3d 457, 472 (S.D.N.Y. 2022) (quoting *Director, Office of Workers' Compensation Programs v. Greenwich Collieries*, 512 U.S. 267, 271 (1994)). The Court explored this issue at oral argument, and Plaintiffs took the position that the Court must, pursuant to the NJBCA, make its own factual findings. Plaintiffs' position is consistent with the language of the NJBCA, which explicitly empowers the Court to make findings regarding the good faith of the board or special committee and the reasonableness of the inquiry. *See* N.J.S.A. 14A3-6.5(1). Further, the parties agreed that the factual record regarding the relevant issues is complete and that no further discovery on these issues can or should be ordered. The Court accordingly concludes that while Rule 56 provides the procedural vehicle by which this motion has come before the Court, the Court is empowered to make findings with respect to whether the Board's decision not to pursue the claims set forth in this matter was made in good faith and after conducting a reasonable inquiry.

**B.**     **Viability of Plaintiffs' Claims under the NJBCA**

Turning to the merits of Kodak's motion, Plaintiffs identify two reasons they should be permitted to pursue their claims:  (1) "while the [Special Committee] Report may have concluded that Plaintiffs' claims lacked merit, neither the Special Committee nor the independent directors of the full Board ever took the required 'vote' to determine that maintaining Plaintiffs' derivative proceeding was not in the best interests of Kodak"; and (2) "the initial Special Committee investigation was neither done reasonably nor in good faith: (i) the [Special Committee's] decision to hire Continenza's longtime counsel Akin Gump tainted the entire investigation; and (ii) the [Special Committee] ignored key facts regarding what MNPI Continenza knew when he made his June Trades, and misrepresented the key fact that Continenza had not precleared his trades in accordance with company policy." (Dkt. 113 at 53 (internal quotation marks omitted)).  The Court considers each of these arguments below.

The Court further notes that while the consolidated complaint alleges that Parrett and New, the two members of the Special Committee, were not independent (Dkt. 129 at ¶¶ 158-161), and Kodak argues to the contrary in its motion (*see* Dkt. 100-33 at 29-32), Plaintiffs did not advance this theory in their opposition.  At oral argument, Plaintiffs confirmed their concession that Parrett and New met the requirements for independence under the NJBCA.

    **1.**     **Vote Requirement**

Plaintiffs first argue that, under the NJBCA, either a special committee or the independent directors must affirmatively vote that maintenance of a shareholder derivative

suit is not in the best interests of the corporation, and that no such vote ever took place here.  (Dkt. 113 at 53-54).  Kodak argues in reply that "the Board voted to reject the maintenance of the derivative proceeding when it voted to adopt the recommendations and conclusions of the [Special Committee] and its 2020 Report and resolved to implement the recommendations as promptly as practicable on September 14, 2020."  (Dkt. 123 at 21 (quotations omitted)).  The Court further notes that the Second Committee Report expressly recommends "that the Committee conclude that the complaints be dismissed in their entirety as not in the Company's best interests and report to and recommend to the Board that the Company take all appropriate steps to dismiss all related derivative lawsuits." (Dkt. 72-6 at 77).  On October 22, 2021, the Second Committee conducted a telephonic meeting at which it unanimously voted to adopt the Second Committee Report.  (Dkt. 135-18 at 21).

The parties' dispute in this regard is a technical one regarding the requirements of the NJBCA.  The parties have cited no case law addressing this specific issue, and the Court has found none in its own research.  Accordingly, the Court focuses on the text of the statute itself.  The NJBCA states that a shareholder derivative proceeding "shall be dismissed by the court on motion by the corporation if the court finds" either that the board or special committee "has determined in good faith, after conducting a reasonable inquiry upon which its conclusions are based, that the maintenance of the derivative proceeding is not in the best interests of the corporation" or that a defined group of shareholders has "voted to terminate the derivative proceeding."  N.J.S.A. 14A:3-6.5(1)(a), (b).  It further provides that the determination regarding whether maintenance of the derivative

proceeding is in the best interests of the corporation shall be made by either "a majority vote of independent directors present at a meeting of the board of directors if the independent directors constitute a quorum" or "a majority vote of a committee consisting of one or more independent directors appointed by majority vote of independent directors, or one independent director if the board consists of only one independent director, present at a meeting of the board of directors, regardless of whether those independent directors constitute a quorum of the board." *Id*. 14A:3-6.5(2)(a), (b).

The question before the Court is thus whether the Board's September 2020 vote to adopt and implement the recommendations and conclusions of the Special Committee and the Special Committee Report constitutes a determination that maintenance of the instant derivative proceeding is not in the best interests of the corporation. The Court finds that it does. The Court's conclusion is driven in part by the distinction between subsections (a) and (b) of N.J.S.A. 14A:3-6.5(1). Plaintiffs argue, essentially, that the "determination" required by subsection (a) must take the form of a vote specifically not to commence or continue litigation, and that a vote addressed to the merits of the claims asserted in the derivative proceeding will not suffice. The language of subsection (a) does not support this narrow reading. Moreover, the language of subjection (b) makes clear that the drafters of the NJBCA knew how to draft a provision strictly dictating the form a vote must take. The broader phrasing of subsection (a) cuts against the conclusion that it likewise requires a vote specifically addressed to the matter of litigation, and not a vote considering more broadly the merits of the asserted claims. *See generally Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004) (setting forth "usual rule" that "when the legislature uses certain

language in one part of the statute and different language in another, the court assumes different meanings were intended" (citation omitted)). In other words, the Court agrees with Kodak that the language of the NJBCA does not "require[] that a board or committee . . . formally convene and conduct a vote to reject by name each and every shareholder demand, rather than [rejecting] the substance of the proffered derivative claims." (Dkt. 123 at 22).

It is clear that the Board, by vote, rejected the substance of the claims asserted in this action. The Special Committee was expressly directed to determine "whether any of Kodak's officers, directors, or senior management engaged in misconduct or illegal activity in connection with any trading or transfers of Kodak stock, including the June Trades, the Karfunkel charitable donation of stock, and the Marx and Southeastern activity; the July 2020 options awards; and the DFC Announcement." (Dkt. 1-2 at 12). Kodak's Board thereafter, by vote, adopted the Special Committee Report's conclusion that "Kodak, and its officers, directors, and senior management did not violate the securities regulations or other relevant laws, engage in a breach of fiduciary duty, or violate any of Kodak's internal policies and procedures." (*Id*. at 8). Plaintiffs' argument that the Court should not view this vote as a determination that maintenance of the instant derivative action would not be in Kodak's best interest defies logic; it cannot possibly serve a corporation's interest to pursue non-meritorious claims against its own executives and board members. The Court does not find that the NJBCA required the Board to word its determination in the highly specific manner argued by Plaintiffs.

Moreover, the adequacy of the Board's September 2020 vote is not dispositive of the issue. Even if the Board's September 2020 vote was insufficiently specific to satisfy the requirements of the NJBCA, the Second Committee's unanimous October 2021 vote clearly did not lack specificity, and appears to independently satisfy the voting requirement of N.J.S.A. 14A:3-6.5. Indeed, Plaintiffs concede that the Board delegated to the Second Committee the decision to evaluate their demands and that the Second Committee took a vote not to maintain the derivative litigation. (Dkt. 135-19 at 54-55). Plaintiffs make no substantive argument as to why the Second Committee's vote is insufficient to satisfy the statutory requirement. The Second Committee's October 2021 vote is an independent and adequate basis to reject Plaintiffs' contention that the NJBCA's vote requirement has not been satisfied.

### 2.      Reasonableness and Good Faith of the Investigation

The Court next considers whether the Special Committee acted in good faith and conducted a reasonable investigation. In performing such a review, "the court's inquiry is not into the substantive decision of the board, but rather is into the procedures employed by the board in making its determination." *In re PSE & G S'holder Litig.*, 173 N.J. 258, 291 (2002) (quotation omitted). Further, "there is no prescribed procedure that a board must follow." *Id*. (quotation omitted). "One of a board's prerogatives in this context is to entrust its investigation to a law firm." *Id*. at 292 (quotation and alteration omitted).

As previously noted, Plaintiffs contend that the investigation in this case was neither reasonable nor in good faith because "(i) the [Special Committee's] decision to hire Continenza's longtime counsel Akin Gump tainted the entire investigation; and (ii) the

[Special Committee] ignored key facts regarding what MNPI Continenza knew when he made his June Trades, and misrepresented the key fact that Continenza had not precleared his trades in accordance with company policy."  (Dkt. 113 at 53 (internal quotation marks omitted)).  The Court disagrees, for the reasons that follow.

      a.      **Akin Gump was not Fatally Conflicted**

The New Jersey Supreme Court has held that a law firm retained to investigate a potential claim cannot have "a disabling conflict that would have tainted its investigation." *In re PSE & G*, 173 N.J. at 292.   It is not necessary that the Court "condone all aspects of the Board's decision-making process or the role played by the . . . firm."  *Id*.  Having briefly served as both investigator and litigation counsel at the same time is not in and of itself a fatal conflict.  *Id*. at 292-93 ("Although the Kasowitz firm needlessly risked creating a conflict by briefly assuming a dual role as the Board's investigator and litigation counsel, the critical question is whether defendants demonstrated bad faith or acted unreasonably in relying on that firm's investigation.").

Plaintiffs argue that Akin Gump had a disabling conflict because it represented Kodak on related matters and had previously been Continenza's personal counsel.  More particularly, Plaintiffs contend that: on July 29, 2020, Kodak retained Akin Gump to represent it "in the face of intense media and governmental scrutiny resulting from the disclosure of the . . . options" granted in July 2020; Akin Gump appeared in the State Court Action after the Second Committee had already hired counsel, seeking an extension of time for Defendants to respond; "Continenza stated . . . that Akin Gump was his counsel in the White Energy matter"; Akin Gump briefly represented Continenza in *Tang v. Eastman*

*Kodak Co.*, No. 6:21-cv-6418 (D.N.J.) (the "*Tang* Matter"), a securities litigation matter arising from the same factual nexus as the instant case[3]; and "Akin Gump was retained on multiple occasions to represent companies where Continenza was either an officer or a director—including Kodak itself."  (Dkt. 135-19 at 33-39, 57, 58).   The Court has considered these alleged conflicts both individually and collectively and concludes that they cannot sustain Plaintiffs' burden of showing a disabling conflict by Akin Gump.

Turning first to the matter of Akin Gump's July 2020 representation of Kodak, contrary to Plaintiffs' assertion that Akin Gump was hired to "to represent the Company and the options recipients in connection with multiple investigations by Congress and the SEC" (*Id.* at 34), there is no evidence in the record before the Court that Akin Gump was retained on behalf of the Option Recipients.  Also unsupported by the evidence of record is Plaintiffs' assertion that Akin Gump "prepared and/or presented materials to the DFC, ostensibly for the purposes of convincing it to give Kodak the DFC Loan."  (*Id.* at 35).  Further, Plaintiffs acknowledge in their papers that Akin Gump was retained because Kodak had "received multiple requests for documents and information from regulators and governmental entities."  (*Id.* at 34-35).  While Plaintiffs contend elsewhere in their papers that "Akin Gump's job was to establish that no wrongdoing had occurred" (*id.* at 57), they cite no evidence for this assertion, and there appears to be no such evidence in the record. The Court sees no disabling conflict in Akin Gump having represented Kodak itself—and not the Option Recipients or other individual defendants—for purposes of responding to

---

[3]       The *Tang* Matter was eventually transferred to this Court and consolidated into the *In re Eastman Kodak Co. Securities Litigation* matter.

governmental inquiries prior to being retained by the Special Committee.  *See Palkon v. Holmes*, No. 2:14-CV-01234 SRC, 2014 WL 5341880, at *4 (D.N.J. Oct. 20, 2014) (finding no disabling conflict of interest where law firm that investigated shareholder demands had previously represented the corporation in an action brought by the Federal Trade Commission, explaining that the law firm "did not have multiple, conflicting duties" because "its obligations in the FTC and shareholder matters were identical: it had to act in [the corporation's] best interest").

The Court next considers the argument that Akin Gump "appeared in the State Action after the Second Committee had already hired counsel, seeking an extension of time for Defendants to file responses."  (Dkt. 135-19 at 58 (citation omitted and emphasis added)).  The evidence of record does not support this contention.  What the evidence shows is that on September 24, 2021, Nixon Peabody LLP, "along with co-counsel Akin Gump," filed a request for an extension of time to respond to Peters' amended complaint in the State Court Action on behalf of Kodak.  (Dkt. 100-10).  On that same date, counsel for the individual defendants submitted their own request seeking the same relief on behalf of their clients.  (Dkt. 100-11).  At a court conference in the State Court Action on September 28, 2021, Akin Gump appeared on behalf of Kodak; the individual defendants were again represented by their own counsel.  (Dkt. 100-12).  The Court finds no conflict where Akin Gump represented Kodak in the State Court Action after its investigation had been completed and the Board had adopted the Special Committee Report.

Plaintiffs also assert that during the September 28, 2021 conference in the State Court Action, "Akin Gump . . . took the opportunity . . . to prejudge the outcome of the

Second Committee's review[.]"  (Dkt. 135-19 at 58).  This is a misrepresentation of the record.  The transcript of that hearing shows that the Akin Gump attorney who presented oral argument on behalf of Kodak made clear that the extension was sought to allow the Second Committee "an opportunity to be able to do a thorough review . . .  and make a decision for the corporation and all the shareholders" and that the Second Committee had "authority to do whatever it deems appropriate."  (Dkt. 100-12 at 12-13).  The Akin Gump attorney further made clear that Akin Gump was "not advising" the Second Committee and that there was new independent counsel.  (*Id*. at 14).  While he did state that he personally did not see "much of anything" in the new allegations included in the amended complaint "that changes anything," he further stated, "<u>at this point it's not for me to make that decision</u>."  (*Id*. at 24 (emphasis added)).  He later reiterated that he was offering only his personal opinion, stating: "I never said, Your Honor, that the company has formed a view that the additional allegations included in the documents were not considered, doesn't change anything.  I said from my standpoint, that's how I see it, and I don't know what the company will or will not conclude through the second Special Committee."  (*Id*. at 31).  Plaintiffs have offered no plausible argument that a single attorney from Akin Gump offering a personal opinion on the viability of the claims in the State Court Action well after the Special Committee Report was finalized creates a conflict, much less a disabling one.

The Court turns next to Akin Gump's alleged representation of Continenza in connection with his service as chairman of the Board of White Energy, Inc. ("White Energy").  The basis for Plaintiffs' assertion that this representation existed is the answer

in the *White Energy* matter, which states that "Akin Gump represented Mr. Continenza and sent documents [related to Continenza's employment agreement with White Energy] to the Board in February 2017." (Dkt. 100-25 at 26). As an initial matter, and as previously explained, while Plaintiffs initially stated that the answer in the *White Energy* matter was verified or sworn, they have since conceded that these statements were erroneous. (Dkt. 126). Accordingly, the Court—as it previously advised the parties—has not considered in its analysis any references to the answer in the *White Energy* matter as having been verified or sworn.

Moreover, one of the attorneys who drafted the answer in the *White Energy* matter has submitted a sworn declaration indicating that the paragraph at issue "is inconsistent with paragraphs 39 and 40 of the Answer, our subsequent interrogatory responses, and my recollection of the facts. To the best of my knowledge, no attorney from Akin Gump personally represented Mr. Continenza in connection with the events relevant to the White Energy Matter or the litigation itself." (Dkt. 100-23 at ¶ 12). Continenza has submitted a sworn declaration confirming that he "did not retain Akin Gump to personally represent [him] in connection with the events relevant to the White Energy Matter or the litigation itself, and I did not compensate Akin Gump for any such representation." (Dkt. 100-27 at ¶ 5). Under the circumstances, the Court does not find the unsworn statement in the *White Energy* answer sufficient to support the conclusion that Akin Gump personally represented Continenza, where sworn statements by those with personal knowledge demonstrate that it was made in error.

With respect to the assertions that "Akin Gump was retained on multiple occasions to represent companies where Continenza was either an officer or a director," and "Continenza also reported having a professional relationship with attorneys . . . [from] Akin Gump arising from their representation of certain companies with which Continenza was affiliated" (Dkt. 135-19 at 38), Plaintiffs have cited to no authority holding that this would create a disabling conflict of interest. It is not uncommon for businesses and the individuals associated with them to form professional relationships with lawyers and law firms, and law firms of course have an interest in cultivating such relationships. However, the existence of a professional relationship does not create the kind of bias that would call into question an attorney's ability to comply with his or her ethical obligations, or otherwise taint the investigation, and Plaintiffs have not identified any cases holding that it does.

Plaintiffs also claim that "[t]here is no record of either the Board or the Special Committee inquiring into Akin Gump's prior relationships with Kodak, Continenza, or others" and that the Special Committee made an "entirely passive decision to hire Akin Gump[.]" (*Id*. at 57). Again, these arguments are not supported by citations to evidence establishing the asserted facts. Moreover, Parrett and New have submitted sworn declarations explaining how and why the Special Committee decided to hire Akin Gump and affirming that the Special Committee was "made aware of Akin Gump's prior work and the July 29, 2020 retention" prior to Akin Gump's retention. (Dkt. 100-14 at ¶¶ 16-17; Dkt. 100-18 at ¶¶ 16-17). Plaintiffs have not identified any evidence controverting these factual representations.

As to the *Tang* Matter, it is undisputed that Akin Gump did briefly appear on behalf of Continenza and Bullwinkle in that action.  Specifically, on September 11, 2020 (<u>after</u> the Special Committee had hired Akin Gump and after Akin Gump had nearly completed its work for the Special Committee), Akin Gump appeared on behalf of Kodak, Continenza, and Bullwinkle "in order to execute and file a stipulation regarding the adjournment of their responses to the complaint, and filed a notice of non-opposition to certain plaintiffs' motion to transfer the case to the United States District Court for the Southern District of New York." (Dkt. 100-29 at ¶ 4).  The record before the Court establishes that Akin Gump did not perform any substantive legal work as to Continenza's defense in connection with the *Tang* Matter.  The purported conflict with respect to the *Tang* Matter thus boils down to Akin Gump having appeared on behalf of Continenza and Bullwinkle for administrative purposes a few days before the Special Committee Report was completed.  While the Court does not view this as a particularly wise course of action, the New Jersey Supreme Court held in *In re PSE & G* that "briefly assuming a dual role as . . . investigator and litigation counsel" does not by itself create a disabling conflict.  173 N.J. at 292-93.  The ministerial work that Akin Gump performed for Continenza in the *Tang* Matter is not sufficient to meet Plaintiffs' burden of showing that the investigation was impermissibly tainted.

*Stepak v. Addison*, 20 F.3d 398 (11th Cir. 1994), does not change the Court's analysis.  *Stepak* was concerned with a law firm's prior representation of "the alleged wrongdoers in proceedings related to the very subject matter that the law firm is now asked to neutrally investigate[.]"  *Id*. at 405.  The *Stepak* court explained that "[t]here is a strong possibility that a 'lingering allegiance' toward the insider defendants will color or

otherwise bias counsel's investigation of the allegations against its former clients, as well as any legal advice counsel provides to the corporation about the matter. This is especially true when the prior representation was in relation to criminal proceedings." *Id*. Moreover, "a law firm that had previously defended the alleged wrongdoers would be hampered in its investigation of the shareholder's allegations by its continuing duty to preserve the secrets and confidences of its former clients." *Id*. at 406. These concerns are not present in this case, where Akin Gump's appearance on Continenza's behalf for administrative purposes only occurred after the Special Committee had hired Akin Gump and after Akin Gump had performed its factual investigation and was in the process of finalizing its report.

*Lewis v. Shaffer Stores Co*., 218 F. Supp. 238 (S.D.N.Y. 1963), also does not compel a different result. While the *Lewis* court did indicate that under the circumstances of that specific case, "it would be wise for the corporation to retain independent counsel, who have had no previous connection with the corporation, to advise it as to the position which it should take in this controversy," *id*. at 239, it did not hold or suggest that the kind of brief simultaneous representation present in this case would irrevocably taint an investigation.

Again, the Court is not suggesting that it condones Akin Gump having briefly served as both investigator and litigation counsel even in a ministerial fashion. It plainly would have been better practice for Continenza to immediately obtain his own counsel in the *Tang* Matter, no matter how routine the work. But the Court need not "condone all aspects of the Board's decision-making process or the role played by" Akin Gump. *In re PSE & G*, 173 N.J. at 292. Instead, the relevant question is whether Akin Gump had "a disabling conflict that would have tainted its investigation," such that the Special Committee's and

the Board's reliance on Akin Gump's investigation was unreasonable or in bad faith. *Id.* at 292-93. The record before the Court in this case does not support such a conclusion.

The Court's holding is further supported by the fact that Crowell, an independent law firm, performed an investigation into whether Akin Gump was conflicted and concluded that it was not. (Dkt. 72-6 at 3). Crowell specifically concluded that "Akin Gump conducted an exhaustive and thorough investigation, and there is no evidence to suggest that its independence was compromised." (*Id.*). Crowell's assessment is further evidence that it was neither unreasonable nor in bad faith for the Special Committee to entrust the investigation to Akin Gump.

### b.   The Special Committee's Inquiry was Reasonable

Plaintiffs further argue that the Special Committee did not perform a reasonable, good faith investigation, because it reached factual conclusions that Plaintiffs contend are false, and because it did not conduct a fulsome investigation into Karfunkel's alleged tax fraud. (Dkt. 135-19 at 61-69). The Court is unpersuaded by these arguments.

The relevant question is whether the Special Committee's inquiry was "so restricted in scope, so shallow in execution, or otherwise so *pro forma* or half hearted as to constitute a pretext or sham." *In re PSE & G*, 173 N.J. at 292 (alteration omitted and quoting *Stoner v. Walsh*, 772 F. Supp. 790, 806 (S.D.N.Y. 1991)). This standard is not even close to being met here.

Akin Gump was tasked with performing a broad investigation into "whether any of Kodak's officers, directors, or senior management engaged in misconduct or illegal activity in connection with any trading or transfers of Kodak stock, including the June Trades, the

Karfunkel charitable donation of stock, and the Marx and Southeastern activity; the July 2020 options awards; and the DFC Announcement."  (Dkt. 1-2 at 12).  Akin Gump performed a six-week investigation, during the course of which it reviewed over 60,000 documents, conducted 44 witness interviews, collected relevant information from a third-party who was unaffiliated with Kodak, and had unfettered access to Kodak's systems and materials.  (*Id*. at 8, 12-13).  Akin Gump's document collection process was robust, and included the retention of third-party vendors to assist in the collection and review of electronic communications.  (*Id*. at 13-14).  The witnesses interviewed included Kodak's "CEO, CFO, General Counsel, Vice President of Government Affairs, Chief Compliance Officer, Controller, members of the public relations team, all members of Kodak's compensation committee, all Board members, and multiple other Kodak employees who were involved in the DFC loan process and the Company's response to the pandemic."  (*Id*. at 15).  Akin Gump ultimately produced an 82-page, comprehensive report, which included forward-looking recommendations to improve Kodak's corporate governance.  "Based on the procedures employed and the seriousness by which" Akin Gump "approached its task," *In re PSE & G*, 173 N.J. at 294, it is clear that the investigation was both reasonable and in good faith.

Plaintiffs' arguments to the contrary are unpersuasive.  They contend that the Special Committee "falsely concluded" that Byrd had precleared Continenza's June Trades in compliance with Kodak's insider trading policies, and that this "was not a good faith, reasonable conclusion."  (Dkt. 135-19 at 62).  They further contend that the Special Committee "ignored material facts" that cast doubt on its conclusion that the DFC loan

application process was at an uncertain stage and viewed as having a low probability of success when Continenza made the June Trades. These arguments are an attack on the substance of the Special Committee's conclusions, which is not the focus of the Court's inquiry under the NJBCA. *In re PSE & G*, 173 N.J. at 291 ("Our next inquiry focuses on whether the Board acted in good faith and with due care in investigating the merits of the litigation. . . . [T]he court's inquiry is not into the substantive decision of the board, but rather is into the procedures employed by the board in making its determination." (internal quotation marks omitted)). The fact that the Special Committee allegedly made a factual error in its report and weighed the evidence differently than Plaintiffs believe it should have been weighed is not sufficient to demonstrate a lack of good faith or to call into question the reasonableness of the investigation.

In support of their position, Plaintiffs rely heavily on *London v. Tyrrell*, No. CIV.A. 3321-CC, 2010 WL 877528 (Del. Ch. Mar. 11, 2010), in which the court held that "if the [investigating committee] gets the undisputed facts wrong in its report, and then relies on its erroneous recitation of the undisputed facts in making its dismissal recommendation," the basis for the committee's recommendation is not reasonable. *Id*. at *17. However, and as Kodak correctly points out, the *London* court was applying the test articulated in *Zapata Corporation v. Maldonado*, 430 A.2d 779 (Del. 1981). The *Zapata* test specifically instructs a reviewing court to inquire into the bases for the committee's conclusions. *Id*. at 788-89. The *Zapata* test does not govern the Court's inquiry under the NJBCA, which— as previously noted—is concerned with process and not with the substance of the determinations.

Unlike the court in *London*, which was applying the *Zapata* standard, the court in *Sojitz Am. Cap. Corp. v. Kaufman*, 141 Conn. App. 486 (App. Ct. of Conn. 2013), was applying a Connecticut statute that, like the relevant provisions of the NJBCA, was derived from § 7.44 of the Model Business Corporation Act. The *Sofitz* court explained that under the relevant standard, "the court may conduct a limited review into the board's conclusions to determine that they follow logically from the inquiry, but may not scrutinize the reasonableness of its determination." *Id*. at 509. "[T]he policy reason for this limited review is that a corporation should be free to determine in its own business judgment whether litigation is in its best interest, free from unnecessary interference." *Id*. at 506 (citation omitted). Nothing in the record before the Court suggests that the conclusions reached by the Special Committee were not based on the investigation or otherwise failed to meet the relevant standard.

The Court does not suggest that pervasive, serious factual errors in a report could not call into question the validity of the investigatory process. However, that is not what Plaintiffs have identified here. Instead, they have identified a single factual error, and an alleged omission of a handful of facts related to the status of the DFC loan application in June of 2020 that Plaintiffs view as material but that the Special Committee did not. This is insufficient to demonstrate that the investigatory process was pretextual or a sham.

Plaintiffs next contend that the Special Committee, via Akin Gump, did not adequately investigate Karfunkel's purported gift to Chemdas Yisroel. (Dkt. 135-19 at 65). According to Plaintiffs, "[t]he Special Committee's choice not to conduct a fulsome investigation into Karfunkel's tax fraud is evidence of its lack of a reasonable, good faith

investigation." *Id*.  The Court again disagrees.  The Special Committee Report indicates that Akin Gump interviewed both Karfunkel and Byrd regarding the gift, and concluded based on those interviews that Karfunkel's gift could not be considered insider trading.  (Dkt. 1-2 at 72-73).  Akin Gump reasonably focused its investigation on whether Karfunkel's gift constituted insider trading, rather than the *bona fides* of the charity and the gift or the potential tax implications.  It is natural and reasonable for the Special Committee and its counsel to have concerned themselves primarily with the corporate governance implications of Karfunkel's actions, and any potential damage to Kodak that could flow therefrom, as opposed to potential tax malfeasance that would be the concern of the Internal Revenue Service.

In sum, the record before the Court establishes that Kodak's Board determined in good faith and after a reasonable inquiry that maintenance of the claims asserted in this action would not be in Kodak's best interest.  Dismissal of this action pursuant to the NJBCA is accordingly mandated, and Kodak's motion seeking the same is granted.  The remaining motions seeking dismissal of the claims on the merits are denied as moot.

## **CONCLUSION**

For the foregoing reasons, the Court grants Kodak's motion to dismiss or for summary judgment (Dkt. 100) to the extent that it grants summary judgment on all of the claims set forth herein pursuant to the NJBCA.  The Court denies the other pending motions to dismiss (Dkt. 101; Dkt. 102; Dkt. 103) as moot.  The Clerk of Court is directed to enter judgment and close the case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:  September 25, 2023
            Rochester, New York